**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

M.O.
c/o Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036;

N.I.
c/o Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036;

P.O.
c/o Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036;

T.P.
c/o Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036; and

A.S.
c/o Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036,

*on behalf of themselves and others similarly situated*
                    *Plaintiffs,*

                –v.–

DAWNISHA HELLAND, in her official capacity as
Acting Assistant Director, ERO Non-Detained Management Division, U.S. Immigration and Customs Enforcement,
U.S. Immigration and Customs Enforcement,
500 12th St. SW
Washington, DC 20536;

**Case No. 1:26-cv-2279**

**CLASS ACTION COMPLAINT**

DAVID VENTURELLA, in his official capacity
as Acting Director of U.S. Immigration and
Customs Enforcement,
U.S. Immigration and Customs Enforcement,
500 12th St. SW
Washington, DC 20536;

MARKWAYNE MULLIN, in his official
capacity as
Secretary of Homeland Security,
Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT
500 12th St. SW
Washington, DC 20536;

DEPARTMENT OF HOMELAND
SECURITY
245 Murray Lane SW
Washington, DC 20528,

*Defendants.*

## INTRODUCTION

1.    This class action challenges the blanket requirement for real-time, continuous GPS monitoring of all noncitizens whom Immigration and Customs Enforcement (ICE) has enrolled into its "Alternatives to Detention" Program (ATD). This new rule—which also mandates increased, in-person check-in appointments—was imposed via an ICE Assistant Director's internal memorandum (the Helland Memorandum) rather than through notice and comment rulemaking, which would have exposed the flaws inherent in such a draconian, blanket requirement.

2

2.      The new rule (the GPS Monitoring Rule) shackles noncitizens with either an ankle or wrist monitor without any individualized justification for why such invasive and harmful monitoring is warranted.

3.      These requirements are contrary to the Immigration and Nationality Act (INA), governing regulations, and decades of ICE policies requiring an individualized, case-by-case assessment to determine appropriate conditions of release. Indeed, ICE had previously recognized that GPS monitoring was not an appropriate one-size-fits-all condition, because it is a more intensive, escalated form of supervision requiring aggravating factors, such as a failure to comply with other conditions of release.

4.      The consequences of the new rule have been swift and sweeping. Based on publicly available data, the number of individuals wearing GPS ankle monitors has nearly tripled—from approximately 17,000 in the months before the issuance of the Helland Memorandum to now more than 46,000—even as the total number of ATD participants has remained essentially stable. ICE is also imposing the wrist-worn GPS monitor on nearly 3,000 individuals—many of whom are pregnant women—for a combined total of nearly 50,000 individuals under ICE's continuous GPS surveillance.

5.      The Named Plaintiffs have experienced significant, ongoing harms from their unjustified shackling. M.O. was told to leave her cleaning job because customers did not want to see an employee with an ankle monitor. Then, when she became pregnant, ICE put her on a wrist monitor—directly contrary to ICE policy barring the imposition of such devices on pregnant women. ICE recently removed the wrist monitor because of a malfunction, but under the Rule, she is at imminent risk of re-imposed GPS monitoring in the near future. M.O. also fears that ICE will put an ankle monitor on her again after she gives birth, as required by the GPS Monitoring Rule.

3

6.      A.S. has lost income because she has needed to go to a program supervision office when her monitor has malfunctioned and has missed work to comply with increased reporting requirements.

7.      The Named Plaintiffs also have suffered physical harms from the ankle monitors. P.O. had to stop breastfeeding her infant child because the monitor has caused her severe pain, dangerously high blood pressure, and depression. N.I.'s ankle monitor has caused such stress and anxiety that it has harmed her ability to breastfeed her child. T.P.'s monitor is painful and makes it difficult to sleep. A.S. suffers from sciatic nerve pain and bleeding from the monitor, and the monitor makes it difficult for her to stand or walk for extended periods of time.

8.      None of the Named Plaintiffs has had any change in their circumstances to justify the escalation of their conditions of release and the significant harms they have endured. The justification, if any, that ICE officers have provided for shackling these individuals and others is the "new policy" or "rule"—i.e., the GPS Monitoring Rule announced by the Helland Memorandum.

9.      But the Helland Memorandum has improved the bottom line for GEO Group, Inc. (GEO), the private prison corporation that formerly employed Defendant Acting ICE Director David Venturella. GEO's subsidiary, BI Incorporated (BI), administers and staffs the "Intensive Supervision Appearance Program" (ISAP) within the ATD program. ISAP is the primary program within ATD; it administers ICE's ankle and wrist monitoring surveillance efforts.

10.     GEO has repeatedly touted to investors that ICE's new rule will increase its profits because it requires ICE to buy GEO's ankle monitors, its most expensive monitoring device. As GEO's chairman told investors, GEO's "margins would substantially increase because of" ICE's new rule.

4

11.    Because the GPS Monitoring Rule and the Helland Memorandum violate the Administrative Procedure Act in several ways, the Named Plaintiffs ask this Court to certify a class of noncitizens shackled with GPS monitors after the issuance of the Helland Memorandum, to vacate the Memorandum and Rule, and to declare that class members are entitled to individualized assessment of their conditions of release without the unlawful Memorandum and Rule.

**JURISDICTION & VENUE**

12.    This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as they arise under federal law, including the Administrative Procedure Act (APA), 5 U.S.C. § 702.

13.    The APA waives the United States's sovereign immunity to claims for relief other than money damages for official action. 5 U.S.C. § 702.

14.    The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

15.    The Court has authority to grant injunctive relief to the individual Named Plaintiffs under 5 U.S.C. §§ 702 and 706, and Rule 65 of the Federal Rules of Civil Procedure.

16.    This Court has authority to grant the requested relief on a class-wide basis under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

17.    Venue properly lies in the District of Columbia because a substantial part of the events giving rise to this action occurred in the District. 28 U.S.C. § 1391(e)(1)(B). Defendants Department of Homeland Security (DHS) and ICE are headquartered in Washington, D.C., and Acting Director Venturella, Secretary Mullin, and Acting Assistant Director Helland maintain their principal offices in Washington, D.C.

**PARTIES**

**A.    PLAINTIFFS**

18.    Plaintiff M.O.[1] lives in Virginia with her three children and her partner. She is currently pregnant with her fourth child. She came to the United States in 2022, fleeing persecution in her home country, and has a pending asylum application. She is also the beneficiary of her daughter's pending application for a T visa,[2] an immigration benefit for a person who is a survivor of human trafficking. For several years before July 2025, M.O.'s only reporting requirement under ATD was an annual check-in with ICE, which she never missed. On or around July 14, 2025, she reported for her annual ICE check-in with her three-month-old daughter, whom she was nursing. ICE officers shackled her with an ankle monitor and told her it was because of a new rule. When she asked whether the ankle monitor was necessary, an ICE officer responded: "What would you prefer? To wear a monitor and be in the program, or to be detained? I think you'd prefer the monitor." After M.O. learned she was pregnant in November 2025, ICE replaced her ankle monitor with a wrist monitor in April 2026. In June 2026, the wrist monitor malfunctioned. An ISAP employee then removed—for now—M.O.'s broken wrist monitor because that ISAP office did not have any more wrist monitors in stock.

19.    Plaintiff N.I. lives in Maryland with her two children and her partner. She arrived in the United States in October 2023, fleeing her home country after suffering gender-based persecution. N.I. has applied for asylum. Before the Helland Memorandum, N.I. completed regular remote check-ins under ATD through an application on her phone called SmartLINK. She has complied with her conditions of release. On or around September 9, 2025, N.I. was required to appear in person at an ISAP office. At the appointment, an ISAP officer put an ankle monitor on

---

[1]Plaintiffs have concurrently filed a motion to proceed pseudonymously for Plaintiffs.
[2]*See* 8 U.S.C. § 1101(a)(15)(T)(i).

her, without providing any reasons, except to tell her that if she did not wear it, she would be detained.

20.     Plaintiff P.O. lives in Maryland and is a single mother to a one-year-old daughter. P.O. was paroled into the United States on a humanitarian basis on or around October 30, 2024. P.O. has applied for asylum. Until April 2026, she had no reporting requirements with ICE or ISAP. But in April 2026, ICE enrolled her in ATD and ordered her to go to the ISAP office in Baltimore, where she was put on an ankle monitor. ISAP employees did not provide her with any reasons as to why she now had to wear an ankle monitor.

21.     Plaintiff T.P. lives in Colorado with her two young children, both of whom have been approved for Special Immigrant Juvenile Status, an immigration benefit for children who have been abused, abandoned, or neglected by a parent, including while living with the non-offending parent.[3] T.P. has a prior removal order, but an asylum officer has found that she has a reasonable fear of persecution or torture if she returns to her home country, so she is seeking protection from deportation on that basis in immigration court. As a survivor of human trafficking, T.P. also has a pending application for a T visa. While T.P. was initially placed on an ankle monitor when she arrived in the United States in 2021, ICE removed the monitor around 40 days later and instructed her to use the SmartLINK app as part of ATD. Until September 2025, T.P. checked in with her local ISAP office via the SmartLINK app. She did not miss any appointments or violate any conditions of release.

22.     On or around September 24, 2025, T.P. attended a scheduled check-in at an ISAP office in Colorado. At that appointment, an ISAP employee put her on an ankle monitor. When she

---

[3]*See* 8 U.S.C. § 1101(a)(27)(J).

asked why, the employee replied that she had done nothing wrong but that President Trump said she had to wear it.

23. Plaintiff A.S. lives in Maryland with her two young children. After arriving in the United States in 2024, ICE put A.S. on an ankle monitor as part of ATD, which was removed around one month later after an asylum officer found she had a credible fear of persecution or torture if returned to her home country, enabling her to apply for asylum. At the time, A.S. was required to check in via phone calls and SmartLINK. She has complied with her conditions of release. A.S. has also applied for asylum.

24. On or around October 6, 2025, A.S. received a message telling her to report to her local ISAP office for an in-person check-in. At the check-in, she was put on an ankle monitor. According to the ISAP employees, the monitor was part of a new program. When A.S. asked to have the monitor removed, ISAP employees told her they would remove it only if she were pregnant or had a medical condition.

### B. DEFENDANTS

25. Defendant Dawnisha Helland, the Acting Assistant Director of the ICE Enforcement and Removal Operations' (ERO) Non-Detained Management Division, is sued in her official capacity. She oversees the Non-Detained Management Division, including the ATD program, and for issuing the Helland Memorandum.

26. Defendant DHS is the department of the federal government that houses ICE, including ICE's division of ERO.

27. Defendant ICE oversees ERO, which in turn is responsible for immigration detention and the ATD program.

28.     Defendant Markwayne Mullin, the Secretary of Homeland Security, is sued in his official capacity. He oversees DHS's administration of the immigration laws as well as the ATD program.

29.     Defendant David Venturella, the Acting Director of ICE, is sued in his official capacity. He is responsible for overseeing ICE's operations, including the administration of the ATD program and implementation of the Helland Memorandum and GPS Monitoring Rule.

## STATEMENT OF FACTS APPLICABLE TO ALL CLAIMS

**I.      The INA and Implementing Regulations Require Individualized Consideration in Setting Conditions for Noncitizens Released from Detention.**

30.     Under the INA, a noncitizen "may be arrested and detained pending a decision on whether" the noncitizen "is to be removed from the United States." 8 U.S.C. § 1226(a).

31.     Except for individuals subject to mandatory detention, the "Attorney General . . . may release" a noncitizen on "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General" or "conditional parole." *Id.* § 1226(a)(2); *see also id.* § 1231(a)(3) (noncitizen with administratively final order of removal who is not timely removed, "shall be subject to supervision under regulations prescribed by the Attorney General").

32.     The authority to prescribe conditions of release is shared by the Attorney General (via immigration judges) and the Secretary of Homeland Security (via ICE officials) pursuant to the Homeland Security Act of 2002, Pub. L. 107-296. While ICE has initial authority to impose conditions of release, if and when an immigration judge reviews a noncitizen's custody, that authority shifts to the immigration judge. Subject to the INA and implementing regulations discussed below, when an immigration judge orders release on conditions, ICE officials do not have authority to impose additional conditions on a noncitizen. *See N- N- v. McShane*, 813

9

F.Supp.3d 496, 500 (E.D. Pa. 2025). The purpose of these conditions is to ensure attendance at immigration hearings and to protect the community. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

33.     Federal regulations govern the exercise of discretion by ICE officials imposing conditions on noncitizens released from detention. None of these regulations provide for the imposition of GPS monitoring or other surveillance without individualized assessment.

34.     Under 8 C.F.R. §§ 236.1(c)(8) and 1236.1(c)(8), "[a]ny officer authorized to issue a warrant of arrest may, in the officer's discretion, release [a noncitizen] not described in section 236(c)(1) of the Act [Section 1226(c)(1)], under the conditions at section 236(a)(2) and (3) of the Act [Section 1226(a)(2), (3)]; provided that the [noncitizen] must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding."

35.     For individuals already subject to an administratively final order of removal, who may be released from detention on discretion or must be released from detention if their actual removal is not reasonably foreseeable, "[t]he district director, Director of the Detention and Removal Field Office, or Executive Associate Commissioner shall impose such conditions or special conditions on release as the Service considers appropriate in an individual case or cases, including but not limited to the conditions of release noted in 8 C.F.R. § 212.5(c) and § 241.5." 8 C.F.R. § 241.4(j)(1).

36.     The only conditions of release "prescribed" in regulations by the Attorney General are found at 8 C.F.R. § 241.5, which applies only to individuals released after an administratively final order of removal is entered. Similar conditions are prescribed by statute. 8 U.S.C. § 1231(a)(3). These prescribed conditions do not include ankle monitors, wrist monitors, or any other form of GPS monitoring as a condition of release. Instead, those conditions include, but are

10

"not limited to": "[a] requirement that the [noncitizen] report to a specified officer periodically and provide relevant information under oath as directed;" "[a] requirement that the [noncitizen] continue efforts to obtain a travel document and assist the Service in obtaining a travel document;" "[a] requirement that the [noncitizen] report as directed for a mental or physical examination or examinations as directed by the Service;" "[a] requirement that the [noncitizen] obtain advance approval of travel beyond previously specified times and distances;" and "[a] requirement that the [noncitizen] provide DHS with written notice of any change of address in the prescribed manner." 8 C.F.R. § 241.5(a).

37.    Individuals in DHS custody under mandatory detention may nonetheless be released on humanitarian parole. For those individuals, conditions of release are governed by 8 U.S.C. § 1182 and 8 C.F.R. § 212.5(d). A release on humanitarian parole requires a finding that the noncitizen "present[s] neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). In deciding whether to place conditions when paroling a noncitizen, "officials should apply reasonable discretion." *Id.* § 212.5(d). The "consideration of all relevant factors includes" the giving of an undertaking or bond, "[c]ommunity ties such as close relatives," and agreement "to reasonable conditions (such as periodic reporting of whereabouts)." *Id.*

**II. There Is Minimal or No Process to Challenge Conditions of Release.**

38.    For an individual released after an administratively final order of removal, there is no regulatory process for challenging their conditions of release.

39.    For individuals who are not subject to an administratively final order of removal, 8 C.F.R. §§ 236.1(d) and 1236.1(d) provide a narrow and time-limited process to challenge their conditions, as described below.

40.     The only way a noncitizen can receive a hearing before an immigration judge regarding their conditions of release is to challenge the *initial* conditions, set by ICE, within seven days of release from detention. According to the regulation, "[a]fter an initial custody determination by the district director, including the setting of a bond, the respondent may, at any time before an order under 8 C.F.R. part 240 becomes final, request amelioration of the conditions under which he or she may be released." 8 C.F.R. § 236.1(d)(1); *see also id.* § 1236.1(d)(1). That request "must be filed within 7 days of release from custody." *Id.* §§ 236.1(d)(1), 1236.1(d)(1).

41.     After "expiration of the 7-day period," a noncitizen "may request review by the district director [of ICE] of the conditions of his or her release."  8 C.F.R. §§ 236.1(d)(2), 1236.1(d)(2). The regulation does not require the ICE district director to issue a decision. The regulation does not provide for a hearing before the immigration judge or another neutral decisionmaker after the seven days from release have passed.

42.     As an example, consider an individual whom ICE releases on Day 1 with the only condition being a check-in with an ICE officer every 2 weeks. On Day 14, ICE imposes an ankle monitor as an additional condition. That individual can no longer challenge the ankle-monitor condition before an immigration judge, because more than seven days have passed since the individual's release from detention.

43.     If the district director *does* issue a decision, the noncitizen may appeal that decision to the Board of Immigration Appeals (BIA) within 10 days of receiving it. 8 C.F.R. §§ 236.1(d)(3)(ii), 1236.1(d)(3)(ii). BIA appellate review is available only if the district director first issues a decision—which the deputy director is not required to provide. There is no requirement that the district director inform a noncitizen of their right to appeal.

12

### III.    The Alternatives to Detention Program.

44.    Although the regulations prescribing conditions of release do not include real-time continuous GPS monitoring of a noncitizen's whereabouts, the Secretary of Homeland Security has included such monitoring in ATD. The purported aim of the ATD program is "to ensure compliance with release conditions."[4] ICE claims that ATD "also increases court appearance rates."[5] Over the past twenty-plus years of the program, ATD has consisted of various sub-programs (*e.g.*, the Case Management Pilot Program, Wraparound Stabilization Services, Young Adult Case Management Program, Family Case Management Program, Compliance Assistance Reporting Terminal), but the largest ATD sub-program is the Intensive Supervision Appearance Program (ISAP).

45.    Some of those ATD programs have returned successful court compliance rates without the use of GPS monitoring. For example, although the Case Management Pilot Program no longer operates, data from 2023 and 2024 indicate that it returned a 98% to 100% court appearance rate by referring individuals to legal and social services organizations that would, among other things, remind them of court dates and explain how to arrange transportation to hearings.

46.    Members of Congress have repeatedly tried, but failed, to enact blanket GPS monitoring for ATD participants. *See* Reshape Alternatives to Detention Act, S. 4364, 118th Cong. § 6 (2006) ("Each [noncitizen] on the nondetained docket of an immigration court shall be enrolled in the Alternatives to Detention program, with mandatory GPS monitoring."); H.R. 8430, 118th Cong. (same) (2024); Dep't of Homeland Sec. Appropriations Act, H.R. 8752, 118th Cong. (2024)

---

[4]*Archive of Alternatives to Detention*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/features/atd [https://perma.cc/9HQ9-7QTU] (last visited June 23, 2026).
[5]*Id*.

(providing funds for DHS to "ensure that every [noncitizen] on the non-detained docket is enrolled into the Alternatives to Detention Program with mandatory GPS monitoring throughout the duration of all applicable immigration proceedings"); Justice for Jocelyn Act, S. 72, 119th Cong. (2025) (identifying purpose of proposed legislation "to enroll all [noncitizens] on the ICE nondetained docket in the Alternatives to Detention program with continuous GPS monitoring"); H.R. 355, 119th Cong. (2025) (same); H.R. 4213, § 224(3) (June 26, 2025) ("ensure that every [noncitizen] on the non-detained docket is enrolled into the Alternatives to Detention Program with mandatory GPS monitoring throughout the duration of all applicable immigration proceedings").

47.    The majority of noncitizens on the nondetained docket are not currently in ATD.[6]

48.    As of April 2026, more than 180,000 individuals are enrolled in ATD, primarily or all in ISAP, which is administered and staffed by BI, a private contractor. This is nearly three times the number of individuals ICE was holding in detention during the same period.[7]

### A. Types of Monitoring Technology

49.    Over time, the ATD program has primarily relied on several types of supervision technology: (1) the SmartLINK App; (2) GPS ankle monitors; (3) GPS wrist monitors; and (4) telephonic reporting.[8]

50.    The SmartLINK App enables monitoring of a noncitizen via a smartphone using biometric facial comparison technology to confirm the participant's identity.

51.    SmartLINK also includes a database of community resources, the ability to upload documents, confirmation of a noncitizen's location during check-in, and a tool for noncitizens to

---

[6]U.S. Dep't of Justice, *Executive Office For Immigration Review Adjudication Statistics* (2026), https://www.justice.gov/eoir/media/1344791/dl?inline [https://perma.cc/J9GU-TTLU] (last accessed June 23, 2026).
[7]U.S. Immigration and Customs Enforcement, *Detention Management* (2026), https://www.ice.gov/detain/detention-management [https://perma.cc/Q5FE-UBXT] (last accessed June 23, 2026).
[8]U.S. Immigration and Customs Enforcement, *ATD Active Programs: Fiscal Years 2017-2021*, (2022), https://www.dhs.gov/sites/default/files/2022-10/ICE%20-%20ATD%20Active%20Programs%20-%20FYs%202017-2021.pdf [https://perma.cc/98NE-946L] (last accessed June 23, 2026).

communicate with ISAP or ICE. SmartLINK allows for push notifications and reminders for upcoming appointments, including court hearing dates and office visit reminders.

52. According to ICE, SmartLINK does not continuously track a noncitizen's location data. Rather, the noncitizen's location data is only sent through the app when the noncitizen signs in and completes a check-in. SmartLINK does not currently allow for real-time location tracking. While SmartLINK can provide continuous location tracking in certain circumstances, ICE has stated that this feature is "currently inactive."[9]

53. The GPS ankle monitor is secured to the noncitizen's ankle and continuously tracks and logs the individual's location and movement history, allowing ICE officers to monitor the noncitizen's location in real time, around the clock. The contract with BI also allows ICE to request GPS Frequency Reports "as needed" to provide detailed information about where a noncitizen spends time, including the specific days of the week and times an individual is at a given location.

54. While claiming that ankle monitors are imposed to ensure noncitizens' compliance with conditions of release, the U.S. government has instead used ankle monitors to surveil immigrants, including compiling information about where they work to conduct law enforcement activities. *See Koch Foods of Mississippi, LLC v. United States*, No. 3:19-CV-627-CWR-FKB, 2020 WL 476380, at *1 (S.D. Miss. Jan. 29, 2020) ("Agent Williams also noted that review of ICE's Alternatives to Detention (ATD) electronic monitoring program—which uses ankle bracelets to monitor location—provided GPS-tracking data showing 21 undocumented people regularly spending 8 to 10 hours a day at the Morton Plant.").

---

[9] U.S. Immigration and Customs Enforcement, *Alternatives to Detention Frequently Asked Questions* (2025), https://www.ice.gov/atd-faq#does-bi-smartlinkr-have-persistent-location-tracking-capabilities [https://perma.cc/7C5A-N7A9] (last accessed June 24, 2026).

55.    ISAP case managers may also program the ankle monitor to send alerts to ISAP when a wearer travels beyond a set distance from home. These geographic restrictions can severely limit a participant's ability to travel to work, medical appointments, their children's schools, to visit family, and other essential destinations.

56.    In addition to the ankle monitor, ATD utilizes a wrist-worn GPS device (also known as a wrist monitor or the "VeriWatch") that also continuously tracks and logs the participant's location and movement history, allowing ICE officers to monitor the participant's location in real time, around the clock.

57.    The final type of monitoring historically available is telephonic reporting, which places an automated call to the participant at a regularly set, pre-determined check-in time. When the participant answers, the system matches the voice to a pre-recorded voice print. It is unclear whether ICE continues to employ this option as a standalone form of monitoring.[10]

58.    ATD conditions can also include either remote or in-person check-ins, often at both a local ICE office and at a local ISAP office. ICE has also imposed curfews and home visits by ISAP employees (scheduled or unscheduled) as part of ATD conditions.[11]

59.    ICE reports that the Average Length In Program (ALIP) for noncitizens enrolled in ATD is more than 2 years—767 days as of April 2026. Some ICE field offices—Detroit, Newark, and St. Paul—report an ALIP of over 1,000 days in the ATD program as of April 2026. For

---

[10]U.S. Dep't of Homeland Security, *Privacy Impact Assessment for the Alternatives to Detention (ATD) Program* (2023) https://www.aila.org/aila-files/71047E47-FE20-4A9E-AE0E-ADAE96174DC1/23042102.pdf [https://perma.cc/FNW5-BXWX] (last visited June 24, 2026).

[11]Memorandum from Wesley J. Lee, Acting Director at the U.S. Immigration and Customs Enforcement to the Field Office Directors, *Eligibility Criteria for Enrollment into Intensive Supervision Appearance Program (ISAP) and the Electronic Monitoring Device (EMD) Program* (May 11, 2005). https://www.ice.gov/doclib/foia/dro_policy_memos/dropolicymemoeligibilityfordroisapandemdprograms.pdf [https://perma.cc/7KTT-JZCJ ] (last visited June 24, 2026).

noncitizens with final removal orders who cannot be removed to their native country for whatever reason, their GPS monitoring by ICE via ATD is potentially indefinite.[12]

60.    GPS ankle monitoring is the costliest form of monitoring available in the ATD program. ICE has also acknowledged that GPS monitoring is the "most intensive" form of monitoring. As of September 2024—months before the Helland Memorandum—fewer than 10% of ATD-ISAP participants had been assigned a body-worn GPS device.[13]

61.    Beyond the financial cost, GPS monitoring causes serious physical and psychological harm to those who are subjected to it. A 2021 empirical study conducted by the Immigration Justice Clinic at Cardozo School of Law surveyed approximately 150 noncitizens subject to ankle monitoring and compiled data from nearly 1,000 legal cases. 90% of individuals surveyed "experienced harm to their physical health due to the electronic ankle shackle," including aches, pains, and cramps, inflammation, scarring, cuts and bleeding, and electrical shocks.[14] 88% of the surveyed participants reported that the ankle monitor negatively impacted their mental health, including anxiety, sleep disruption, social isolation, depression, and thoughts of suicide.[15]

62.    ICE has specifically recognized that body-worn GPS monitoring is inappropriate for pregnant, postpartum, and nursing individuals. ICE Directive 11032.4 (Pregnancy Directive), "Identification and Monitoring of Pregnant, Postpartum, or Nursing Individuals," states that if ICE "determines ATD enrollment is an appropriate condition of release, individuals known to be pregnant, postpartum or nursing will not be placed on a form of ATD that requires a radio frequency

---

[12]U.S. Immigration and Customs Enforcement, *Alternatives to Detention*: *FY26 Detention Stats.*, https://www.ice.gov/doclib/detention/FY26_detentionStats_04092026.xlsx (last visited June 24, 2026).

[13]Memorandum from ERO Asst. Dir. to Asst. Dir. Field Off. Dep. Field Off. Dir. and Asst. Field Off. Dir., *General Availability Use of VeriWatch Wrist-Worn Technology for Alternatives to Detention (ATD) Intensive Supervision Appearance Program (ISAP) Participants,* (Feb. 28, 2024, 1:25:04 PM).

[14]Giustini, *et al.*, *Immigration Cyber Prisons: Ending the Use of Electronic Shackles*, Cardozo Law, Online Publications (2021), https://larc.cardozo.yu.edu/faculty-online-pubs/3 [https://perma.cc/L4UW-75WE] (last visited June 24, 2026).

[15]*Id.*

17

or global positioning system monitor be worn."[16] Upon information and belief, ICE has either de facto rescinded the Pregnancy Directive, which would violate the APA, or the Helland Memorandum's GPS Monitoring Rule violates that directive, which remains available on ICE's website.

**B. ICE Has Consistently Required Individualized Assessment of ATD Conditions Across Multiple Administrations**

63.    Prior to the Helland Memorandum, ICE historically applied a case-by-case review based on an individualized assessment of the ATD participant's specific circumstances to determine the appropriate type of monitoring technology (if any) and the frequency and type of check-ins.

64.    The individualized determination for appropriate supervision is required by the INA, ICE's own regulations and policies, and the Due Process Clause of the Fifth Amendment.

65.    ICE's own website confirms this requirement. ICE's Immigration Guide webpage states that "ISAP determines how much supervision is necessary on a person-by-person basis."[17]

66.    A separate ATD page on ICE's website, which ICE describes as "content from a previous administration or is otherwise outdated" and "not reflective of current practice," states that each noncitizen "enrolled in ATD-ISAP receives an individualized determination as to their level of supervision." The current Immigration Guide webpage still links to this archived ATD webpage.[18]

---

[16]U.S. Immigration and Customs Enforcement, *Directive: Identification and Monitoring of Pregnant, Postpartum, or Nursing Individuals* (2021), https://www.ice.gov/directive-identification-and-monitoring-pregnant-postpartum-or-nursing-individuals [https://perma.cc/4ZS6-YRD6] (last accessed June 24, 2026).

[17]U.S. Immigration and Customs Enforcement, *Alternatives to Detention*, (2025), https://portal.ice.gov/immigration-guide/atd (last accessed June 24, 2026).

[18]U.S. Immigration and Customs Enforcement, *Alternatives to Detention,* (2026), https://www.ice.gov/features/atd [https://perma.cc/3SQX-K86U] (last accessed June 24, 2026).

67.     As that guide describes, in deciding on the appropriate level of supervision "in both initial placement and changes to supervision level," ICE "consider[s] certain factors," which "include criminal history, compliance history, community or family ties, caregiver concerns, and other humanitarian or medical concerns."[19]

68.     This individualized approach has been consistent across more than a decade of ICE policy under multiple administrations:

- In a 2005 memorandum to field office directors, ICE explained that "each individual case is reviewed carefully" to determine whether ATD is appropriate and if so, the proper level of supervision. The memorandum further states that individuals in ISAP should be subjected to "decreasing levels of restrictions as participants demonstrate compliance."[20]

- In a 2015 directive to all field personnel, ICE stated: "In cases in which enrollment [in ATD] would be a reasonable condition of release, the [noncitizen] should be assigned an appropriate level of electronic monitoring on a case-by-case basis."[21]

- ICE's June 2017 ATD ISAP Handbook—which ICE headquarters officials confirmed, in a 2022 Government Accountability Office investigation, is "the program's standard operating procedure"[22]—directs that a "participant is assigned to the most appropriate level of supervision and technology based upon a multitude of factors," including but

---

[19] *Id.*

[20] Memorandum from Wesley Lee, Acting Director, U.S. Immigration and Customs Enforcement to Field Office Directors, *Eligibility Criteria for Enrollment into Intensive Supervision Appearance Program (ISAP) and the Electronic Monitoring Device (EMD)Program,* (May 11, 2005), https://www.ice.gov/doclib/foia/dro_policy_memos/dropolicymemoeligibilityfordroisapandemdprograms.pdf [https://perma.cc/7KTT-JZCJ] (last visited June 24, 2026).

[21] Email from ERO Taskings to Field Office Directors, Deputy Field Office Directors, and Assistant Field Office Directors (July 24, 2015, at 4:18:59 PM) (listing several factors for ATD).

[22] Gov't Accountability Off., *Alternatives to Detention: ICE Needs to Better Assess Program Performance and Improve Contract Oversight*, (June 22, 2022) https://www.gao.gov/products/gao-22-104529 [https://perma.cc/2E3X-8MWT]. (GAO 2022 Report).

not limited to "current immigration status, criminal history, compliance history, community or family ties, caregiver or provider concerns, and other humanitarian conditions."[23]

• A July 2022 policy memorandum on the use of ATD at border locations reiterates that "[t]he level of supervision and technology assigned to noncitizens enrolled in the ATD program is determined on a case-by-case basis."[24]

• At a December 2022 symposium on the ATD program, then-ICE Acting Director Tae D. Johnson reiterated that ATD places participants "under the appropriate level of supervision specific to their individual case."[25]

• In a December 2024 presentation—less than a year before the Helland Memorandum was issued—ICE reaffirmed that: an ICE ATD officer "takes into account numerous factors when determining the most appropriate levels of case management and technology assignment. Some factors include, but are not limited to: current immigration status, supervision history, pending criminal charges, convictions, being a caregiver/provider, community ties, medical/humanitarian needs, etc." The same presentation further confirmed: "There is no singular factor that determines the most appropriate levels of whether or not to increase, decrease, or remain the same. Officers

---

[23]U.S. Immigration and Customs Enforcement, *Alternatives to Detention – Intensive Supervision Appearance Program* (2017) https://www.ice.gov/doclib/foia/policy/handbookATD_08.16.2017.pdf [https://perma.cc/PA6P-KDUP] (last visited June 26, 2026).

[24]Memorandum from Chris Magnus, U.S. Customs and Border Protection Commissioner, *et al.* to Raul L. Ortiz, U.S. Border Patrol Chief, *et al.* (July 18, 2022) https://litigationtracker.justiceactioncenter.org/sites/default/files/2023-03/flnd%20-%203-2021-cv-01066%20-%20July%2018,%202022%20Parole%20and%20ATD%20memo_0.pdf [https://perma.cc/947D-X7W5] (last visited June 26, 2026).

[25]Press Release from U.S. Immigration and Customs Enforcement, *ICE hosts Alternatives to Detention program symposium,* (Dec. 2, 2022), https://www.ice.gov/news/releases/ice-hosts-alternatives-detention-program-symposium [https://perma.cc/2TY4-ENQJ ] (last visited June 24, 2026).

20

exercise discretion based upon a totality of circumstances. With regards to ankle vs wrist-worn device, there is not specific guidance indicating which should be used in what circumstances."[26]

- Less than six months before the Helland Memorandum was issued, ICE told members of Congress that it conducts "individualized case reviews to ensure the appropriate levels of case management and technology are assigned to each participant," and that "it is not appropriate to assume there is a 'one-size-fits-all' response to release conditions." ICE reiterated that "[a]n ankle bracelet or a wrist-worn device is ***not appropriate*** for all participants, nor is it required." (emphasis added).[27]

### C.  ICE Policy Previously Reserved GPS Monitoring for Aggravating Circumstances.

69.    Consistent with its individualized assessment policy, ICE has previously escalated participants to GPS ankle monitoring only upon a finding of aggravating factors.

70.    ICE's policy as of April 5, 2021, was that "ICE should first look to the use of SmartLINK or Telephonic Reporting (TR) as the primary means of enrollment unless there are aggravating factors that would necessitate the use of GPS technology."[28]

71.    The defined aggravating factors included, but were not limited to, "[n]o access to a smartphone with a U.S. telephone number and data plan"; "[h]istory of program non-compliance"; "[p]ending criminal charges or criminal convictions"; "[p]ublic safety concerns"; "[o]perational

---

[26]U.S. Immigration and Customs Enforcement, ISAP-V Industry Day Questions and Answers, (December 2, 2024), https://sam.gov/workspace/contract/opp/df08a077fa3546d99fba3420ba239810/view.

[27]Letter from Sean M. Hackbarth, Deputy Asst. Dir. Off. Of Cong. Relations to Rep. Byron Donalds (December 26, 2024) https://donalds.house.gov/uploadedfiles/ice_response_to_rep_donalds.pdf [https://perma.cc/T95D-UHBS] (last visited June 26, 2026).

[28]Email from ERO Assistant Directors to Field Office Directors and Deputy Field Office Directors, "Use of Technology for New ATD Enrollments" (Apr. 5, 2021).

time constraints"; "[n]o residence or home address"; and "[n]ational security concerns or terroristic ties."[29]

72.     That policy further explained that: "In the event a participant is placed on SmartLINK or TR, and is found to be non-compliant with program requirements, the participant should then be considered for GPS."

73.     ICE has consistently viewed GPS monitoring as an escalation of supervision that requires greater justification compared to SmartLINK or telephonic reporting.

74.     In a presentation from around 2019 or 2020, ICE acknowledged that changing an individual's condition from SmartLINK or telephonic reporting to ankle or wrist GPS monitoring would be an "escalation" necessitating "articulating factors," such as police contacts or arrests, or signs of flight risk:

---

[29]*Id.*



**ICE** **Escalation**

Changing the level of participant's monitoring from TR/SmartLink to GPS or frequency of OV & HV

ATD officer must have articulating factors

§ Failed office visit or failed home visit

§ Police contact or arrest

§ Number of alerts generated (GPS, SmartLink & Telephonic Alerts)

§ Signs of Flight Risk

U.S. Immigration and Customs Enforcement

75.     That principle extended to wrist monitoring as well. In a February 28, 2024, policy email, ICE stated: "VeriWatch [wristwatch monitoring] is an intermediate technology between SmartLINK and GPS ankle-worn device, and generally intended for ATD ISAP participants who are non-compliant with SmartLINK technology or have pending charges for nonviolent criminal offenses. VeriWatch is not for use on ATD ISAP participants who are pregnant, have a serious medical condition, or are enrolled in the Family Expedited Removal Management program."[30]

---

[30]Email from Acting Asst. Dir. to Asst. Dir., Dep. Asst. Dir., Field Off. Dir., Dep. Field Off. Dir., and Asst. Field Office Dir., "General Availability Use of VeriWatch Wrist-Worn Technology for Alternatives to Detention (ATD) Intensive Supervision Appearance Program (ISAP) Participants" (Feb. 28, 2024).

### D. ICE Policy Required Regular Review and De-Escalation for Compliant Participants in ATD.

76.    ICE's own policies also direct officers to review each participant's supervision conditions every 30 days for potential de-escalation.[31]

77.    According to the archived ATD FAQ webpage, "[o]ne of ICE's recommended best practices is to perform compliance reviews every 30 days a participant is enrolled in the ATD ISAP program." The purpose of these reviews is to "ensure[] that a participant has the most appropriate form of case management and supervision."[32]

78.    As part of the review, ICE officials should determine whether participants need a different level of supervision, "such as moving participants from GPS monitoring (the most costly and intensive monitoring technology) to less costly and intensive technology, such as smartphone application monitoring or telephonic reporting."[33]

79.    For example, if a noncitizen complies with their initial ATD conditions, "ERO field officials should 'de-escalate' them to a lower level of supervision, such as smartphone application monitoring and a lower frequency of home and office visits."

80.    The ATD Handbook similarly requires regular reviews of a participant's case to determine whether the level of supervision should be changed. "Compliant participants receive reduced monitoring and technology" and more stringent supervision conditions are reserved for "[h]igher risk participants." "In all cases, the ATD officer uses a monitoring continuum established

---

[31]Dep't of Homeland Sec, U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations, Case Management for ATD – ISAP Participants,* (March 5, 2021).

[32] U.S. Immigration and Customs Enforcement, *Alternatives to Detention Frequently Asked Questions* (2025), https://www.ice.gov/atd-faq#does-bi-smartlinkr-have-persistent-location-tracking-capabilities [https://perma.cc/7C5A-N7A9] (last accessed June 24, 2026).

[33]GAO 2022 Report at 29.

at the discretion of the local AOR to allow for gradual changes in monitoring," unless "individual circumstances require deviation."[34]

81.     For that reason, although M.O., T.P., and A.S. were put on ankle monitors immediately after their arrival in the United States, those monitors were removed shortly thereafter—until the Helland Memorandum required them to be put back on.

82.     And, in a December 2024 communication to members of Congress, ICE stated that "the vast majority" of ATD participants are not on body-worn GPS monitoring "because they have demonstrated compliance and do not require the more expensive higher form of technology."[35]

83.     Moreover, a May 28, 2024 memorandum—rescinded without public notice on October 28, 2025—stated that "ERO officers are required to conduct regular and recurring case reviews, and will consider the use of the appropriate technology based on available resources and relevant ERO policy as well as the mitigating and aggravating circumstances of each migrant."[36]

---

[34]U.S. Immigration and Customs Enforcement, *Alternatives to Detention Handbook – Intensive Supervision Appearance Program*, (Aug. 16, 2017).

[35]Letter from Sean M. Hackbarth, Deputy Asst. Dir. Off. Of Cong. Relations to Rep. Byron Donalds (Dec. 26, 2024).

[36]Memorandum from Daniel A. Bible, *Revised Reporting Requirements for Non-Detained Migrants* (May 28, 2024), *available at* https://www.ice.gov/doclib/foia/policy/24000.pdf.

III.   **The Helland Memorandum Announces the GPS Monitoring Rule Imposing Blanket GPS Monitoring and Increased In-Person Check-Ins.**

84.    On June 9, 2025, Defendant Dawnisha Helland, Acting Assistant Director of ERO's Non-Detained Management Division, sent an email to "All ERO Personnel," titled "Increase of In-Person Check-Ins at Contractor Offices for ATD Participants." This is the Helland Memorandum.

| | |
|---|---|
| **To:** | **All ERO Personnel** |
| **Subject:** | **Increase of In-Person Check-Ins at Contractor Offices for ATD Participants** |
| **BLUF:** | Please see below for changes to reporting requirements for aliens assigned to the ATD program. |

**Details:**
- Post-order aliens in the ATD program, currently assigned to virtual check-ins, will now move to in-person check-ins.
- If the alien is not being arrested at the time of reporting, escalate their supervision level to GPS ankle monitors whenever possible and increase reporting requirements, regardless of case type (i.e., pre-order or post-order).
- Do not release any aliens on Order of Release on Recognizance (OREC) or Order of Supervision (OSUP) without technology.
- All pregnant females should be placed on wrist-worn technology.
- Local BI contractor offices can provide detailed reports to Field Offices of upcoming check-ins.

Questions related to this message can be directed to Unit Chief ▮▮▮▮▮▮▮▮▮▮

85.    The "BLUF" (Bottom Line Up Front) stated "Please see below for changes to reporting requirements for aliens assigned to the ATD program."

86.    The first requirement mandated that "post-order aliens in the ATD programs" who were "currently assigned to virtual check-ins, will now move to in-person check-ins."

87.    The Helland Memorandum then directed: "If the alien is not being arrested at the time of reporting, escalate their supervision level to GPS ankle monitors whenever possible and increase reporting requirements, regardless of case type (i.e., pre-order or post-order)."

26

88.    The one exception to the blanket ankle-monitor requirement was for pregnant women: "All pregnant females should be placed on wrist-worn technology." No exception was mentioned for postpartum or nursing individuals.

89.    The Helland Memorandum further mandated: "Do not release any aliens on Order of Release on Recognizance (OREC) or Order of Supervision (OSUP) without technology."

90.    ICE did not publicize the Helland Memorandum or its GPS Monitoring Rule or reveal them on ICE's website, but ICE did publish a nearly entirely redacted version of the Helland Memorandum on or around April 30, 2026.[37]

91.    The Helland Memorandum prescribes a rule—blanket GPS monitoring for ATD participants—that members of Congress have failed to pass as legislation.

92.    Following the Helland Memorandum, Acting Executive Associate Director Marcos D. Charles issued a separate memorandum on October 28, 2025, titled "Reporting Requirements for Aliens Released from ICE Custody" (the Charles Memorandum). The Charles Memorandum "establishes the mandatory use of Alternatives to Detention (ATD) programs for all eligible [noncitizens] released on bond, an Order of Release on Recognizance (OREC), parole, or under an Order of Supervision (OSUP)." It also rescinded a prior policy memorandum, *Revised Reporting Requirements for Non-Detained Migrants* (May 28, 2024).

93.    The Charles Memorandum equates enrollment in ATD with GPS monitoring. It directs that "all eligible [noncitizens] currently in removal proceedings or issued a final order and who have been released on bond, under OREC, OSUP, or parole, must concurrently be enrolled in

---

[37]ICE only released the heavily redacted version of the memorandum in response to FOIA litigation. *See* Memorandum from ERO Asst. Dir. to All ERO Personnel, *Increase of In-Person Check-Ins at Contractor Offices for ATD Participants,* https://www.ice.gov/doclib/foia/policy/memoIncreaseInPersonCheckInsContractorOfficesATD_Participants_060920 25.pdf. [https://perma.cc/73BF-6WSH] (last visited June 24, 2026). The FOIA request sought the memorandum itself and any other documents implementing, modifying, superseding or rescinding it. In response, ICE has so far produced only the (heavily redacted) memorandum itself.

27

an ATD program absent a court order issued by an immigration judge expressively *[sic]* prohibiting the use of GPS monitoring." Consistent with the Helland Memorandum, the Charles Memorandum presumes that a noncitizen in ATD will be shackled with GPS monitoring unless an immigration judge "express[]ly" prohibits it.

94.    The Charles Memorandum further instructs that Field Offices "shall continue calling in eligible aliens who were previously released without reporting requirements to adjust to an ATD program and scheduled reporting requirements."

95.    Finally, in a one-sentence section titled "Supervisory Oversight," the memorandum states that "Supervisory Detention and Deportation Officers must review and recommend changes to reporting and ATD requirements based on individual case circumstances," demonstrating that any reduction in the monitoring and reporting requirements established by the Helland and Charles Memoranda needs approval from a supervisor.

**IV.    ICE Officers Implement the Unlawful Helland Memorandum and its GPS Monitoring Rule.**

96.    As a result of the Helland Memorandum and the GPS Monitoring Rule, ICE has indiscriminately escalated individuals' monitoring to ankle monitors and, for pregnant women, wrist monitors.

97.    This change is evident from ICE's actions on the ground and its own statistics.

98.    At N.I.'s September 2025 appointment, an ISAP employee in Maryland stated that all immigrants in Maryland were now required to wear ankle monitors, regardless of their personal circumstances.

99.    At M.O.'s ICE appointment in July 2025, an officer told her that she and other immigrants at the appointment needed to wear ankle monitors because of a "mandate from the new administration."

100.    At A.S.'s appointment, she was told by an ISAP officer that her ankle monitor was part of a new program. T.P. was told by an ISAP officer that President Trump said she had to wear the ankle monitor.

101.    Similar to Plaintiffs' experiences, and according to public reporting, ICE officers in the Chantilly, Virginia field office stated, in July 2025, "Everybody in here needs to either wear hardware or be detained."[38]

102.    At BI's ISAP office in Manassas, Virginia, ISAP employees stated that "new laws" required a noncitizen to wear an ankle monitor.[39]

---

[38]Silvia Foster-Frau and Douglas MacMillan, *ICE moves to shackle some 180,000 immigrants with GPS ankle monitors*, Wash. Post, July 24, 2025, https://www.washingtonpost.com/immigration/2025/07/24/ice-check-in-ankle-monitor-immigrants/.
[39]*Id.*

103.    As recently as April 2026, ICE officers at the Baltimore, Maryland field office explained that the ankle monitoring policy was "new" and "out of their hands." An officer stated that they had an "order" to enroll all individuals in removal proceedings in ATD, which the officer equated to receiving an ankle monitor. The officer also stated that, for an ankle monitor to be removed, an individual would need "perfect or near perfect compliance for a year" before submitting a request to ICE for removal of the monitor. In just one day, ICE placed ankle monitors on approximately 41 individuals at the Baltimore field office.

104.    At ICE offices in Georgia in April 2026, ICE officers stated that "everyone" was required to be on ankle or wrist monitors, required by the "new policies" from the administration.

105.    At ICE offices in San Francisco in October 2025, ICE officers asserted that anyone released from ICE custody was required to enroll in ISAP and receive an ankle monitor.

106.    At ICE offices in Philadelphia in May 2026, ICE officers stated that "there are changes in the [ATD] policy and they are going in a different direction" that requires individuals located in Philadelphia who are in removal proceedings to be outfitted with an ankle monitor and enrolled in ISAP. As a result, an ISAP officer stated that "everyone is getting ankle monitors."

107.    Since the Helland Memorandum, ICE has also routinely flouted the release conditions (or lack thereof) imposed by immigration judges in bond proceedings, instead following the Helland Memorandum's directive to impose ankle monitoring. Even where an immigration judge releases a noncitizen from detention without ankle monitoring, ICE has unilaterally imposed that condition, even though the regulations at 8 C.F.R. §§ 236.1, 1236.1 do not permit ICE to impose additional conditions of release after an immigration judge has granted release on bond.

108.    Noncitizens have brought habeas petitions challenging this unlawful imposition of custody, with overwhelming success. *See, e.g.*, *Harrington v. Albarran*, No. 26-CV-01889-JST,

2026 WL 800113, at *3 (N.D. Cal. Mar. 23, 2026) ("[A]s multiple sister courts have done on similar facts, the Court finds that the government is violating Harrington's due process rights by subjecting him to ankle monitoring and ISAP supervision without notice and a hearing to determine whether those measures are warranted."); *see also N- N- v. McShane*, 813 F.Supp.3d 496, 500 (E.D. Pa. 2025); *Diahn v. Lowe*, No. 1:24CV1936, 2026 WL 84576, at *1 (M.D. Pa. Jan. 12, 2026); *da Silva v. LaForge*, No. 25CV17095 (EP), 2026 WL 45165, at *4 (D.N.J. Jan. 7, 2026); *Montes Aguillon v. Bondi*, No. EP-26-CV-71-KC, 2026 WL 531899, at *2 (W.D. Tex. Feb. 25, 2026); *Batz Barreno v. Baltasar*, No. 25-CV-03017-GPG-TPO, 2026 WL 120253, at *2 (D. Colo. Jan. 15, 2026). In each of those cases, however, the noncitizen remained subject to the unlawful GPS monitoring condition—in some instances for months—before obtaining judicial relief.

109.    ICE has even enrolled noncitizens in ISAP and shackled them with ankle monitors contrary to rulings from district court judges requiring ICE to release a noncitizen from detention without conditions. *See, e.g.*, *Solis v. Noem*, No. 2:26-CV-00053-RFB-EJY, 2026 WL 776981, at *1 (D. Nev. Mar. 19, 2026) ("Disturbingly, this Court's Order apparently did not deter ICE from continuing to egregiously violate Petitioner's rights, despite never asserting a legitimate interest in depriving him of his liberty."); *Abdeltawab v. Armant*, No. EDCV 26-01520-MWF (DTB), 2026 WL 1710301, at *1 (C.D. Cal. June 4, 2026) (granting motion to enforce preliminary injunction and requiring removal of ankle monitor).

110.    The government has also taken the position in habeas cases that challenges to conditions of release are not the proper subject of a habeas petition. *See, e.g.*, *Harrington v. Albarran*, No. 26-CV-01889-JST, 2026 WL 800113, at *5 (N.D. Cal. Mar. 23, 2026); *Orellana Juarez v. Moniz*, 788 F. Supp. 3d 61, 67 (D. Mass. 2025).

111.    ICE's own publicly available statistics confirm that the Helland Memorandum announced a rule imposing new blanket restrictions on release conditions. ICE provides Fiscal Year statistics on the ATD program, including the number of participants on each type of monitoring.

112.    At the end of FY2024 (September 30, 2024), there were 179,071 individuals in ATD: (a) 17,225 were on ankle monitors; (b) 6,049 on wrist monitors; (c) 2,231 on VoiceID; (d) 153,098 on SmartLINK; (e) 461 on dual technologies; and (f) seven individuals were participating in ATD without technology.[40]

113.    As of March 7, 2025, there were 183,784 individuals in ATD: (a) 17,155 were on ankle monitors; (b) 4,997 on wrist monitors; (c) 1,608 on VoiceID; (d) 159,953 on SmartLINK; (e) 67 individuals on dual technologies; and (f) four individuals on no technology.

114.    But, by the end of FY2025 (September 20, 2025)—during which the Helland Memorandum was in effect for several months—the number of ankle monitors increased to 30,249, while ATD individuals on SmartLINK decreased to 147,461. Wrist monitoring decreased to 2,492.[41]

115.    FY2026 data shows that the number of individuals on ankle monitors has continued to increase, while those on SmartLINK have continued to decrease. As of February 7, 2026, there were 135,279 individuals on SmartLINK—a decrease of approximately 12,000 individuals from

---

[40]U.S. Immigration and Customs Enforcement, *Alternatives to Detention*: *FY24 Detention Stats.*, https://www.ice.gov/doclib/detention/FY24_detentionStats.xlsx (last visited June 25, 2026).
[41]U.S. Immigration and Customs Enforcement, *Alternatives to Detention*: *FY25 Detention Stats.*, https://www.ice.gov/doclib/detention/FY25_detentionStats09242025.xlsx (on file with U.S. Department of Homeland Security) (last visited June 25, 2026).

the end of FY 2025—while the individuals on ankle monitors increased by about the same amount, 12,000, to 42,115.[42]

116. The same trend continued into April 2026. As of April 4, 2026, the number of individuals on ankle monitors had increased (from February 7, 2026) by over 4,000, to 46,302 individuals, while the number of individuals on SmartLINK had decreased (from February 7, 2026) by nearly 4,000, to 131,643 individuals. Wrist monitoring increased to 2,707 individuals.[43]

117. According to GEO's May 6, 2026 investor call, the number of ATD individuals on ankle monitors is now 48,000.[44]

118. Compared to 2024—the year before the Helland Memorandum—the number of individuals on ankle monitors has now nearly tripled, to approximately 48,000. Over that time, the total number of individuals in ATD overall has increased by less than 1,000. Combining ankle monitoring and wrist monitoring, ICE currently has almost 50,000 people under constant GPS surveillance.

119. Moreover, independent research confirms that GPS monitoring does not improve court compliance rates.

120. A 2021 empirical study based on data collected by a research team at Cardozo School of Law found that individuals provided with legal services and other social services appeared at court hearings, ICE's own metric of compliance, at a higher rate than individuals subject to ankle monitors.[45]

---

[42]U.S. Immigration and Customs Enforcement, *Alternatives to Detention*: *FY26 Detention Stats.*, https://www.ice.gov/doclib/detention/FY26_detentionStats_04092026.xlsx (on file with U.S. Department of Homeland Security) (last visited June 25, 2026).
[43]*Id.*
[44]George Zoley, Exec. Chairman, The GEO Group, Inc., GEO Group, Inc. (GEO) Q1 2026 Earnings Call Transcript (May 6, 2026).
[45]Giustini, Tosca; Greisman, Sarah; et al., "Immigration Cyber Prisons: Ending the Use of Electronic Shackles," (2021) https://larc.cardozo.yu.edu/faculty-online-pubs/3 [https://perma.cc/5XMX-63RH] (last visited on June 25, 2026).

121.    The American Bar Association Commission on Immigration reached the same conclusion in 2024, noting that "[t]he available evidence does not establish that monitoring improves appearance rates," and the "overwhelming majority of migrants—well above 90% in many categories" appear for their court dates even during periods of time when the use of monitoring was less prevalent.[46]

## V. With No Change in Their Circumstances, Plaintiffs Are Shackled under the Helland Memorandum's GPS Monitoring Rule and Suffer Loss of Income and Health Problems.

122.    Each of the Named Plaintiffs was shackled with an ankle monitor or wrist monitor after the issuance of the Helland Memorandum. ICE did not provide any reason—apart from the new rule—for this change in conditions. They have suffered significant consequences from this unjustified escalation of their release conditions.

123.    **_M.O._** After M.O. was put on an ankle monitor in July 2025, she lost her cleaning job. When she told her employer about the monitor, her employer told her to stop working because the employer did not want clients to think that a criminal was coming into their homes. She has been unable to find a job since.

124.    Once M.O. became pregnant, her ankle monitor was replaced with a wrist monitor. Eventually, that device stopped working and was removed because, at the time, ISAP did not have a replacement unit available. Both the ankle and wrist monitors caused M.O. significant stress, anxiety and depression, and she has been prescribed anti-depressant medications. The wrist monitor caused M.O. even greater stress because it had to be charged frequently, sometimes every couple of hours, causing her to wake up in the middle of the night to charge the device to avoid calls from ISAP. Because the Helland Memorandum and GPS Monitoring Rule remain in effect,

---

[46]American Bar Association, Commission on Immigration, *Electronic Monitoring of Migrants: Punitive not Prudent*, https://www.americanbar.org/content/dam/aba/administrative/immigration/electronic-monitoring-report-2024-02-21.pdf (last visited June 25, 2026).

there is a significant and substantial risk that ICE will once again shackle M.O., whether with a wrist monitor while she is pregnant, or an ankle monitor after she gives birth.

125. **_N.I._** N.I.'s ankle monitor causes her pain, swelling, and scarring—at times preventing her from walking. She brought a letter from her doctor to ISAP staff seeking to have her monitor removed because of these symptoms, but she has not received any response.

126. N.I. is also nursing her daughter. Because of the stress and pain from the monitor, N.I. can no longer produce milk from one of her breasts. Her doctor has told her that the likely cause of this medical issue is the negative health effects of the ankle monitor, and N.I. is worried about developmental consequences for her child. N.I. also suffers from posttraumatic stress disorder, with feelings of depression and anxiety. Because of the stigma of wearing an ankle monitor, N.I. no longer goes to church or wants to be seen in public.

127. **_P.O._** P.O.'s ankle monitor is painful, making it difficult for her to walk up steps, squat, or bend. It can be so painful that P.O. cannot sleep at night. The stress of wearing the monitor has caused P.O. to have dangerously high blood pressure. And she now suffers from depression, crying nearly every day since the monitor has been put on. Because of the stress and pain of the monitor, she has stopped breastfeeding her daughter. P.O.'s attorney has asked ICE to remove the ankle monitor, and ICE stated that they would provide the information to ISAP. ISAP reportedly has not received any order from ICE to remove the monitor.

128. In addition, the increased check-in requirements have impeded P.O.'s efforts to obtain employment. She was set to start a work-readiness program run by a nonprofit organization but was told she could not attend the program because of her reporting requirements. P.O., who does not have a car, must travel a long distance to an ISAP office that is not easily accessible via public transportation.

129.   **_T.P._** For T.P., the ankle monitor is painful and has prevented her from sleeping. As a survivor of human trafficking, her shackling forces her to relive her past traumatic experiences.

130.   **_A.S._** The ankle monitor cuts A.S.'s leg, resulting in bleeding. A.S. also suffers from sciatic nerve pain on the same leg. She cannot stand for extended periods while wearing the ankle monitor because of its size and weight, which affects her work as a hairstylist. A.S. also experiences mental distress—in particular when the monitor loses signal or malfunctions as she worries that ICE will come and take her away. Once, when the ankle monitor malfunctioned overnight, A.S. had to miss the full day of work the next day to go to the ISAP office to have it fixed, causing her to lose a day's worth of income. A.S. has also had to take time off work to attend more frequent check-ins and home visits, resulting in additional lost income.

## VI. The Unlawful Helland Memorandum's GPS Monitoring Rule Burdens Taxpayers While Increasing GEO's Profits.

131.   The harms caused by the Helland Memorandum and its GPS Monitoring Rule include increased costs to American taxpayers. Based on ICE's data, the "Daily Tech Cost"[47] of ATD has increased by over $50,000 per day due to the nearly three-fold increase in GPS ankle monitoring since the end of FY2024. That amounts to an additional cost to taxpayers of $18 million per year.

132.   If the remaining 130,000 noncitizens on SmartLINK were shackled with ankle monitors under the Helland Memorandum and GPS Monitoring Rule, that would cost taxpayers over $130 million per year, a more than $80 million increase over the cost of SmartLINK for the same number of individuals.

---

[47]According to ICE, the "Daily Tech Cost" is "only related to technology costs, and do[es] not include other associated contract and case management costs that are a part of the ATD program." U.S. Immigration and Customs Enforcement, *Alternatives to Detention*: *FY24 Detention Stats.*, https://www.ice.gov/doclib/detention/FY24_detentionStats.xlsx (last visited June 25, 2026).

133. This drastic increase in costs is because, according to ICE, the cost of ankle monitors is nearly triple the cost of SmartLINK. While SmartLINK's cost is less than one dollar per day per individual, ankle monitors cost nearly 3 dollars per day per individual.

134. ICE has previously recognized that "[s]ince its first implementation in FY 2018, SmartLINK has lowered the overall costs of the ATD program by making up a larger share of the participant population each year."[48]

135. By mandating GPS ankle monitors—the most expensive release condition—the Helland Memorandum and GPS Monitoring Rule have benefited GEO, and its subsidiary BI, which produces the ankle and wrist monitors. In July 2025, ICE extended GEO's ISAP contract for another year, forgoing a competitive bid process. GEO has increased its production of GPS monitors in response to ICE's new rule.

136. The revolving door between GEO and ICE is in full swing. Defendant Venturella, the Acting Director of ICE who previously oversaw the ICE division that manages contracts for immigrant detention centers, spent years at GEO, both as an employee and a consultant. He joined ICE in 2025 immediately after serving as a consultant to GEO.

137. Despite federal ethics rules prohibiting government employees from working on contracts awarded to their previous employers for one year, Defendant Venturella obtained a waiver freeing him from those ethical constraints.

---

[48]U.S. Immigration and Customs Enforcement, *ATD Active Programs, Fiscal Years 2017 - 2021*, Fiscal Year 2021 Report to Congress, at 3 (Aug. 25, 2022).

138.    Now at liberty to help his prior employer, Defendant Venturella "met with executives from GEO to discuss the immigrant tracking program" just "[a] few days before the ankle monitoring contract was extended."[49]

139.    GEO has repeatedly highlighted the financial benefits of ICE's new GPS monitoring requirements to investors. As GEO's Executive Chairman, George Zoley, stated on a November 2025 earnings call, the "new policy" has resulted in "a steady increase in more intensive and higher-priced monitoring devices such as ankle monitors and a steady decrease in the less intensive and lower-priced use of phones or phone apps."[50]

140.    On an August 2025 earnings call, Zoley stated "We've stocked up the inventory of our monitoring devices and are well-positioned to assist the federal government to scale up the use of GPS tracking for non-detained illegal aliens once ICE detention capacity has been maximized."[51]

141.    On its November 6, 2025 earnings call, which followed closely after the issuance of the Charles Memorandum, GEO revealed that its contract forecasted 361,000 noncitizens in ATD in year one, and 465,000 in year two. GEO was "optimistic that ISAP ramp-up could begin early next year" and told investors it "has the capability in monitoring devices and case management services to achieve those significantly increased participation levels and far beyond."[52]

---

[49]Douglas MacMillan and Aaron Schaffer, *The former private prison exec behind ICE's immigrant detention surge*, The Wash. Post, Aug. 1, 2025, https://www.washingtonpost.com/business/2025/08/01/ice-david-venturella-geo-immigration-detention/.

[50]George Zoley, Exec. Chairman, The GEO Group, Inc., The GEO Group, Inc. (GEO) Q3 2025 Earnings Call Transcript (Nov. 6, 2025) (GEO Q3 Tr.).

[51]George Zoley, Exec. Chairman, The GEO Group, Inc., The GEO Group, Inc. (GEO) Q2 2025 Earnings Call Transcript, (Aug. 6, 2025).

[52] GEO Q3 Tr.

142.     On GEO's earnings call in February 2026, Zoley acknowledged that GEO provides the SmartLINK App "at a very nominal cost." But, he stated, "the ankle monitors, I believe, is our most expensive monitoring devices, so the margins would substantially increase" as ICE moved individuals from SmartLINK to ankle monitors.[53]

143.     In a "Confidential" investor presentation on March 12, 2026, GEO identified "[p]otential future growth in electronic monitoring" as one of its "Growth Highlights."[54]

144.     And, in its most recent earnings call on May 6, 2026, GEO emphasized that they "continued to see steady technology shift to more intensive and higher priced monitoring devices such as ankle monitors."[55]

## CLASS ACTION ALLEGATIONS

145.     M.O., N.I., P.O., T.P., and A.S. bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

146.     M.O., N.I., P.O., T.P., and A.S. seek to represent the following class: All noncitizens enrolled, or who will be enrolled, in ICE's Alternatives to Detention program who, on or after June 9, 2025, have been or will be required to wear a body-worn GPS monitor—either an ankle monitor or wrist monitor.

147.     The proposed class satisfies the prerequisites of Rule 23(a) and 23(b)(2). It satisfies the numerosity requirement of Rule 23(a)(1) because the class includes anyone who has been or will be subject to the Helland Memorandum's GPS Monitoring Rule directing that ICE impose GPS monitors without individualized assessment. As of April 2026, more than 180,000 individuals

---

[53]George Zoley, Exec. Chairman, The GEO Group, Inc., GEO Group, Inc. (The) REIT (GEO) Q4 FY2025 earnings call transcript (Feb. 12, 2026).

[54] The GEO Group, Inc., Investor Presentation (Mar. 12, 2026), https://investors.geogroup.com/static-files/e52e91b4-e18b-4fb2-aac2-edf8c2323aeb.

[55]George Zoley, Exec. Chairman, The GEO Group, Inc., GEO Group, Inc. (GEO) Q1 2026 Earnings Call Transcript (May 6, 2026).

are enrolled in ATD. Although the exact number of individuals who will be subject to a GPS monitor pursuant to the Helland Memorandum's GPS Monitoring Rule is not known, the number of ATD participants on ankle monitors has increased by approximately 31,000 individuals from March 7, 2025, through April 4, 2026.

148.    The proposed class satisfies the commonality requirement of Rule 23(a)(2) as their claims share common issues of fact or law, including but not limited to whether Defendants' rule escalating individuals to GPS monitors without individualized assessment is a legislative rule required to proceed through notice and comment rulemaking, is arbitrary and capricious agency action, violates the INA, governing regulations, and ICE's own policies requiring individualized assessments, and violates procedural due process.

149.    The proposed class also satisfies the typicality requirement of Rule 23(a)(3). The claims of the proposed class representatives are typical of claims for that class because M.O., N.I., P.O., T.P., and A.S. were all subjected to GPS monitors without individualized assessment of the appropriate conditions of supervision after June 9, 2025.

150.    Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no conflict of interest with the putative class members, will fairly and adequately protect the interests of the class, and understand and accept their responsibilities as class representatives.

151.    The proposed class satisfies the requirements of Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, as they have a rule, to which everyone in the class is subject, of escalating all individuals in ATD to GPS monitoring without individualized assessment of the appropriate conditions of supervision. Final declaratory relief therefore is appropriate to the class as a whole.

152.    Counsel for Plaintiffs have extensive experience litigating class actions and cases involving civil and constitutional rights generally, and the rights of noncitizens specifically, and are therefore qualified to be certified as class counsel pursuant to Rule 23(g).

## CLAIMS FOR RELIEF

### Count 1 – Administrative Procedure Act
### Failure to Proceed through Notice and Comment Rulemaking

153.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

154.    The APA requires that legislative rules be promulgated through notice and comment rulemaking. 5 U.S.C. § 553.

155.    The GPS Monitoring Rule announced by the Helland Memorandum is an invalid legislative rule because it did not go through notice and comment rulemaking.

156.    The GPS Monitoring Rule announced by the Helland Memorandum is a legislative rule because it is binding on ICE and imposes new substantive obligations. It requires ICE officers to "escalate" an individual's supervision to ankle monitors "whenever possible" regardless of individual circumstances, to increase reporting requirements for all ATD participants, and to put pregnant women on wrist monitors.

157.    Indeed, Congress explicitly tried and failed multiple times—including as recently as June 2025—to pass legislation that would require exactly what the Helland Memorandum implemented via internal email.

158.    This rule alters the rights or interests of noncitizens, and trenches on their substantial private rights and liberty interests, in a manner that is sufficiently grave that notice and comment are needed to safeguard the policies underlying the APA. The GPS Monitoring Rule announced by the Helland Memorandum alters the rights and interests of tens of thousands of ATD

41

participants, including Plaintiffs, who prior to the Memorandum, had a right to individualized assessment of their supervision conditions grounded in two decades of ICE policy, agency regulations, and the INA.

159. Individuals, like Plaintiffs, who would not have been subject to ankle monitoring before the Helland Memorandum, are now shackled with ankle or wrist monitors because of the Helland Memorandum and its GPS Monitoring Rule. This has resulted in the escalation of tens of thousands of individuals to GPS monitoring, without any individualized justification.

160. The GPS Monitoring Rule announced by the Helland Memorandum also eliminates the discretion of ICE officers, who must impose GPS monitoring on ATD participants without regard to individual circumstances, in contravention of the INA, due process, and ICE regulations and policies. The Helland Memorandum was issued to all ERO personnel nationwide, uses mandatory language directing officers to "escalate" supervision to ankle monitors "whenever possible," to increase reporting requirements, and to "not release" individuals without surveillance technology. ICE field officers across multiple field offices have described it as binding policy leaving them no discretion.

161. Congress directly imposed only one mandatory condition (posting $1,500) of release on bond. Congress also authorized the Attorney General, now the Secretary of DHS, to prescribe conditions of release, either by a published regulation after notice and comment establishing a general standard to be imposed on an individualized basis, or by individualized decisions so long as the conditions imposed reasonably effectuated the statutory purpose of reducing flight risk and ensuring public safety. Congress did not authorize the blanket imposition of a condition through an internal memorandum issued by an Assistant Director of a division within the ERO Directorate of ICE.

### Count 2 – Administrative Procedure Act
### Arbitrary and Capricious Agency Action

162. Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

163. The APA authorizes the Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The new requirements in the Helland Memorandum's GPS Monitoring Rule are arbitrary and capricious.

164. The GPS Monitoring Rule announced by the Helland Memorandum constitutes final agency action subject to substantive review under the APA because it marks the consummation of the agency's decision-making process, determines rights or obligations, and produces legal consequences.

165. Because Defendants gave no explanation for this new rule, Defendants failed to provide Plaintiffs and the public with a reasoned justification for the reversal of longstanding policy. For more than 20 years, ICE policies directed ICE officers to use a case-by-case assessment of each individual's circumstances to determine the appropriate level of ATD supervision. Indeed, less than six months before the Helland Memorandum, ICE represented to members of Congress that individualized assessment was required and that blanket GPS monitoring—exactly what the GPS Monitoring Rule and Helland Memorandum now require—would be inappropriate and contrary to the purpose of ATD. Defendants offered no explanation for why a more than two decades-long position recently communicated to members of Congress was suddenly and secretly reversed. Rather, Defendants "decide[d] to depart from decades[]-long past practices and official policies" without offering a reasoned explanation, or any explanation, for that change, thus

violating a "central principle of administrative law." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

166.    Defendants have also "entirely failed to consider [] important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Specifically, Defendants failed to consider: (1) the serious physical, psychological, economic, and other harms of GPS monitoring; (2) the relevant statutory and regulatory constraints under the INA or due process rights of affected noncitizens; (3) the absence of any evidence that the Helland Memorandum improves compliance over less burdensome alternatives—and evidence that it in fact does not; (4) the significant additional cost to taxpayers without a corresponding benefit; (5) the negative impacts of imposing GPS monitors on pregnant, postpartum, or nursing individuals and their children; and (6) Plaintiffs' significant reliance interests. The failure to consider these issues is arbitrary and capricious.

167.    Plaintiffs have developed significant reliance interests on the prior ATD policy. They complied with their conditions of release, with the understanding that such compliance, in accordance with longstanding policy, would not result in escalation of their conditions of release. Yet, without any opportunity to be heard or any notice, Plaintiffs' supervision has now escalated to real-time, body-worn GPS monitoring, imposing serious harms on Plaintiffs.

### Count 3 – Administrative Procedure Act
### Contrary to Immigration and Nationality Act

168.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

169.    The APA authorizes the Court to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

170.    The INA requires individualized determinations when setting conditions of release. *See I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 194 (1991). "[I]n the absence of such judgments, the legitimate exercise of discretion is impossible in this context." *Id.*

171.    The GPS Monitoring Rule announced by the Helland Memorandum violates the INA because it imposes a blanket rule of ankle monitoring—or wrist monitoring for pregnant individuals—and increased reporting requirements for ATD participants, without any consideration of an individual's circumstances.

172.    Indeed, the GPS monitoring conditions are not "prescribed" by any regulations as conditions of release, and nothing in the INA permits the blanket imposition of such conditions without any relation to an individual's particular circumstances. The GPS Monitoring Rule announced by the Helland Memorandum effectively eliminates the discretionary authority of ICE officers under the INA to set appropriate conditions of release based on an individual's circumstances.

### Count 4 – Administrative Procedure Act
### Violation of the *Accardi* Doctrine

173.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

174.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

175.    The GPS Monitoring Rule announced by the Helland Memorandum violates the APA under the *Accardi* doctrine because agencies must adhere to their own policies and regulations, and the failure to do so violates the APA. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), *superseded by statute on other grounds*.

45

176. Defendants' own regulations and policies require individual assessment of a noncitizen's circumstances in setting conditions of release. For example, regulations state, in the context of a noncitizen without an administratively final order of removal, that an ICE officer "may, in the officer's discretion, release [a noncitizen] not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act." 8 C.F.R. §§ 236.1, 1236.1. Likewise, for individuals with an administratively final order of removal, ICE "shall impose such conditions or special conditions on release as the Service considers appropriate in *an individual* case or cases." 8 C.F.R. § 241.4(j) (emphasis added); *see also* 8 C.F.R. § 212.5(d) (directing that "officials should apply reasonable discretion" when setting conditions of release for someone paroled into the United States on a humanitarian basis, including "consideration of all relevant factors").

177. The ISAP Handbook (the agency's standard operating procedure for that program) and ICE policies also require a case-by-case assessment of conditions of release for individuals in the ATD program. According to ICE's current website, "ISAP determines how much supervision is necessary on a person-by-person basis." On information and belief, the ISAP Handbook and policies remain standard operating procedure and have not been rescinded.

178. The GPS Monitoring Rule announced by the Helland Memorandum directly contradicts those regulations and policies.

179. And, to the extent that Defendants have not rescinded policies prohibiting the imposition of GPS devices on pregnant, postpartum, or nursing women, including ICE's Directive 11032.4, "Identification and Monitoring of Pregnant, Postpartum, or Nursing Individuals," (July 1, 2021), the Helland Memorandum's GPS Monitoring Rule violates those policies as well.

180. As a result, Defendants have violated their own binding policies and regulations.

**Count 5 – Administrative Procedure Act**
**Violation of Procedural Due Process**

181.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

182.    The APA authorizes the Court to set aside agency action that is "contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(B).

183.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving any person of liberty without due process of law and applies to all persons within the United States regardless of immigration status. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

184.    Plaintiffs have a constitutionally protected liberty interest in remaining free from the physical restraint imposed by GPS monitoring and other onerous ATD conditions. *Id.* at 690. "Freedom from imprisonment—from government custody, detention, *or other forms of physical restraint*—lies at the heart of the liberty that [the Due Process] Clause protects." *Id.* (emphasis added).

185.    The GPS Monitoring Rule announced by the Helland Memorandum and ICE regulations provide no process before GPS monitors or increased reporting requirements are imposed on individuals already in the ATD program.

186.    For the Named Plaintiffs, the escalation occurred at the moment they arrived for a check-in, with no prior warning and with no ability to contest the GPS Monitoring Rule's application to them because it is a blanket, mandatory rule, and the only alternative would have been brick-and-mortar detention.

187.    For individuals already in the ATD program who receive a GPS monitor after they have been released from detention for more than seven days, there is no opportunity to challenge the imposition of the GPS monitor before a neutral decisionmaker.

47

188.    For noncitizens in the ATD program with an administratively final removal order, there is no regulatory process to challenge the imposition of a GPS monitor before a neutral decisionmaker.

189.    The only regulatory process available for noncitizens without an administratively final removal order is that a noncitizen may ask ICE to change the condition of release, but there is no guarantee that ICE will even respond to such a request. Several of the Named Plaintiffs have asked ICE to have their monitor removed, without receiving a decision. And ICE itself is bound by the Helland Memorandum, making the request illusory. While there is a theoretical appeal to the Board of Immigration Appeals, that exists only if ICE provides a decision. ICE also does not inform non-citizens of their right to appeal to the BIA. And the BIA is an appellate body, which does not engage in factfinding. 8 C.F.R. § 1003(d)(3)(iv).

190.    In practice, ICE routinely fails to respond to requests for amelioration of monitoring conditions since the issuance of the Helland Memorandum.

191.    The absence of any response mechanism or deadline for agency action means that participants who submit amelioration requests have no recourse if ICE does not act.

192.    The process Defendants provide is constitutionally inadequate under *Mathews v. Eldridge*, 424 U.S. 319 (1976). The private interest—freedom from physical restraint in the form of continuous GPS surveillance, geographic limitations, and onerous reporting requirements—is substantial. The risk of erroneous deprivation is acute because the Helland Memorandum and GPS Monitoring Rule mandate GPS monitoring categorically, with no individualized assessment. Likewise, there is insufficient administrative process to safeguard against erroneous deprivations of liberty, and adding additional process—such as timely individualized review by an ICE officer or review before an Immigration Judge—would not be unduly burdensome to the government.

And the government's interest in imposing GPS monitoring, as opposed to other forms of electronic monitoring or other conditions of release, is weak, given evidence showing that GPS monitors do not improve compliance and that the blanket shift to GPS monitoring has increased taxpayer costs.

193. Alternatively, the process Defendants provide is constitutionally inadequate under *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). The Helland Memorandum and GPS Monitoring Rule provide for *no* notice of the imposition of a GPS monitor, much less notice that is reasonably calculated to afford noncitizens an opportunity to present their objections. Likewise, the GPS Monitoring Rule affords no opportunity to present an objection to any decisionmaker—neutral or otherwise.

194. The GPS Monitoring Rule announced by the Helland Memorandum is therefore unconstitutional on its face, and it must be set aside.

## PRAYER FOR RELIEF

Plaintiffs request that this Court:

1. Certify this case as a class action and certify the class.

2. Appoint Named Plaintiffs M.O., N.I., P.O., T.P., and A.S. as representatives of the class.

3. Appoint undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g).

4. Declare that Defendants' actions violate the APA because Defendants did not promulgate the Helland Memorandum or its GPS Monitoring Rule through notice and comment,

their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and their actions are "contrary to constitutional right." 5 U.S.C. § 706 (2)(A)-(D).

5.      Vacate and set aside the Helland Memorandum and the GPS Monitoring Rule under 5 U.S.C. § 706(2).

6.      Declare that Defendants must provide Named Plaintiffs and Class Members with an individualized reassessment of what conditions, if any, are appropriate without consideration of the GPS Monitoring Rule or Helland Memorandum.

7.      Order that Defendants provide Named Plaintiffs with an individualized reassessment of what conditions, if any, are appropriate without consideration of the GPS Monitoring Rule or Helland Memorandum.

8.      Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

9.      Award any other relief the Court deems necessary.

Respectfully submitted,

Date: June 26, 2026

*/s/ Ivano M. Ventresca*
Ivano Ventresca (D.C. Bar No. 1045769)
**ZUCKERMAN SPAEDER LLP**
2100 L Street NW, Suite 400
Washington, DC 20037
Phone: 202.778.1842
Email: iventresca@zuckerman.com

Ariella Muller (N.Y. Bar No. 5722699)*
**ZUCKERMAN SPAEDER LLP**
485 Madison Avenue, 19th Floor
New York, NY 10022
Phone: 212.704.9600
Email: amuller@zuckerman.com

Kirk MacKinnon Morrow (Bar No. MD0235)
**ZUCKERMAN SPAEDER LLP**
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Phone: 410.332.0444
Email: kmackinnonmorrow@zuckerman.com

*/s/ Adina Appelbaum*
F. Evan Benz (N.C. Bar. No 49077)*+
Lauren Hodges (A.Z. Bar No. 038791)*++
Adina Appelbaum (D.C. Bar No. 1026331)
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
Phone: 202.331.3320
Email: adina@amicacenter.org
evan@amicacenter.org

*/s/ Sarah E. Decker*
Sarah E. Decker (Bar No. NY0566)
**ROBERT & ETHEL KENNEDY HUMAN
RIGHTS CENTER**
1300 19th Street NW, Suite 750
Washington, DC 20036
Phone: 908.967.3245
Email: decker@kennedyhumanrights.org

Anthony Enriquez (Bar No. NY0626)
Sarah T. Gillman (Bar No. NY0316)
**ROBERT & ETHEL KENNEDY HUMAN
RIGHTS CENTER**
88 Pine Street, 8th Floor, Suite 801
New York, New York 10005
Phone: 646.289.5593
Email: enriquez@kennedyhumanrights.org
gillman@kennedyhumanrights.org

*\*Pro hac vice* forthcoming

+Not admitted in D.C.; working remotely
from N.C. and admitted in N.C. and GA only
++ Not admitted in D.C.; admitted in AZ only

51