**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

M.O., *et al.*, *on behalf of themselves and others similarly situated,*

*Plaintiffs,*

–v.–

DAWNISHA HELLAND, *et al.*,

*Defendants.*

**Case No. 1:26-cv-02279**

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
**AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 2

A. ICE's ATD Program .......... 2

B. The Helland Memorandum .......... 3

C. Implementation of the GPS Monitoring Rule .......... 4

D. The Putative Class Action .......... 7

LEGAL STANDARD .......... 8

ARGUMENT .......... 9

A. The Proposed Class Satisfies the Requirements of Rule 23(a). .......... 9

1. The Proposed Class Satisfies Numerosity. .......... 9

2. The Proposed Class Satisfies Commonality. .......... 12

3. The Proposed Class Satisfies Typicality. .......... 14

4. The Proposed Class Satisfies Adequacy. .......... 15

B. Class Certification is Appropriate under Rule 23(b)(2). .......... 16

C. The Court Should Designate Plaintiffs' Counsel as Class Counsel. .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**CASES**


*A.B. v. Haw. State Dep't of Educ.*,
30 F.4th 828 (9th Cir. 2022) .......... 10

*Baby Neal for and by Kanter v. Casey*,
43 F.3d 48 (3d Cir. 1994) .......... 14

*Brito v. Barr*,
395 F. Supp. 3d 135 (D. Mass.),
*modified by* 415 F. Supp. 3d 258 (D. Mass. 2019) .......... 11

*Brown v. District of Columbia*,
928 F.3d 1070 (D.C. Cir. 2019) .......... 12

*Bynum v. District of Columbia*,
214 F.R.D. 27 (D.D.C. 2003) .......... 13, 14

*Carolina Migrant Network v*
*Immigr. Customs Enf't*,
No. 3:26-cv-00028 (W.D.N.C.) .......... 19

*Coleman ex rel. Bunn v. District of Columbia*,
306 F.R.D. 68 (D.D.C. 2015); .......... 9, 18

*Crowe v. Fed. Bureau of Prisons*,
No. 24-cv-3582 (APM),
2025 WL 1635392 (D.D.C. June 9, 2025) .......... 18

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) .......... 12

*DL v. District of Columbia*,
302 F.R.D. 1 (D.D.C. 2013),
*aff'd*, 860 F.3d 713 (D.C. Cir. 2017) .......... 9, 18

*DL v. District of Columbia*,
713 F.3d 120, 125 (D.C. Cir. 2013) .......... 12

*Encinas v. J.J. Drywall Corp.*,
265 F.R.D. 3 (D.D.C. 2010) .......... 19

*Garcia Ramirez v. U.S. Immigr. & Customs Enf't*,
338 F. Supp. 3d 1 (D.D.C. 2018) .......... 18

*Garnett v. Zeilinger*,
301 F. Supp. 3d 199 (D.D.C. 2018) .......... 16

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) .......... 14

*Gutierrez v. Noem*,
No. CV 25-1766 (SLS),
2025 WL 3496390 (D.D.C. Dec. 5, 2025) .......... 17, 18

*Hinton v. District of Columbia*,
567 F. Supp. 3d 30 (D.D.C. 2021) .......... 18

*Howard v. Liquidity Servs. Inc.*,
322 F.R.D. 103 (D.D.C. 2017) .......... 9

*In re Lorazepam & Clorazepate Antitrust Litigation*,
202 F.R.D. 12 (D.D.C. 2001) .......... 15

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019) .......... passim

*Lewis v. United States Parole Comm'n*,
351 F.R.D. 64 (D.D.C. 2026) .......... 12

*Love v. Bureau of Prisons*,
No. 24-CV-2571 (APM),
2026 WL 1724705 (D.D.C. June 15, 2026) .......... 13

*Mondragon v. Scott Farms, Inc.*,
No. 5:17-cv-356-FL,
2019 WL 6125928 (E.D.N.C. Nov. 18, 2019) .......... 11

*N.S. v. Dixon*,
No. 1:20-CV-101-RCL,
2026 WL 2110726 (D.D.C. July 22, 2026) .......... 16

*N.S. v. Hughes*,
335 F.R.D. 337 (D.D.C. 2020) .......... 10, 15

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019) .......... passim

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) .......... 10

*Pablo Sequen v. Albarran*,
835 F. Supp. 3d 1061 (N.D. Cal. June 23, 2026) .......... 18

*Pigford v. Glickman*,
182 F.R.D. 341 (D.D.C. 1998) ........ 14, 16

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) ........ 10

*Radosti v. Envision EMI, LLC*,
717 F. Supp. 2d 37 (D.D.C. 2010) ........ 9

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) ........ 17

*Robertson v. District of Columbia*,
816 F. Supp. 3d 77 (D.D.C. 2026) ........ 17

*Scott v. Clarke*,
61 F. Supp. 3d 569 (W.D. Va. 2014) ........ 11

*Steele v. United States*,
159 F. Supp. 3d 73 (D.D.C. 2016) ........ 13

*Torres v. Del Toro*,
No. 1:21-CV-306-RCL,
2021 WL 4989451 (D.D.C. Oct. 27, 2021) ........ 13

*Twelve John Does v. District of Columbia*,
117 F.3d 571 (D.C. Cir. 1997) ........ 15

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........ passim

**STATUTES**

8 U.S.C. § 1226(a) ........ 11

Administrative Procedure Act, 5 U.S.C. § 551 ........ passim

Immigration and Nationality Act, 8 U.S.C. § 1101 ........ 8, 13

**OTHER AUTHORITIES**

7AA Wright & Miller,
Fed. Prac. & Proc. § 1775 (3d ed. 2026) ........ 16

**RULES**


D.D.C. L. Cv. R. 23.1(b) ........ 1

D.D.C. L. Cv. R. 7(m) ........ 1

Fed. R. Civ. P. 23(a) ........ passim

Fed. R. Civ. P. 23(b) ........ passim

Fed. R. Civ. P. 23(c) ........ 8

Fed. R. Civ. P. 23(g) ........ 9, 18, 19

Pursuant to Federal Rule of Civil Procedure 23 and Local Rule 23.1(b), Plaintiffs M.O., N.I., P.O., T.P., and A.S. respectfully move for certification in this civil action of a plaintiff class comprising all noncitizens enrolled, or who will be enrolled, in Immigration and Customs Enforcement's Alternatives to Detention program who, on or after June 9, 2025, have been or will be required to wear a body-worn GPS location tracking device. Plaintiffs likewise request that the Court appoint Plaintiffs' counsel as class counsel.[1]

## INTRODUCTION

Plaintiffs M.O., N.I., P.O., T.P., and A.S. (Proposed Class Representatives) bring this lawsuit as a putative class action to challenge Defendants' blanket requirement for real-time, continuous GPS monitoring of all noncitizens whom Immigration and Customs Enforcement (ICE) has enrolled into its "Alternatives to Detention" (ATD) program. This new rule (GPS Monitoring Rule) was imposed via an ICE Assistant Director's memorandum (the Helland Memorandum), rather than through notice and comment rulemaking, and shackles noncitizens with either an ankle or wrist GPS monitor without any individualized justification.

By this motion, Proposed Class Representatives seek certification of a class (Proposed Class) composed of all noncitizens enrolled in ICE's Alternatives to Detention program who, on or after June 9, 2025, have been or will be required to wear a GPS monitor—either an ankle monitor or a wrist monitor. Certification is appropriate because the Proposed Class meets the prerequisite requirements of Rule 23(a) and satisfies the requirements of Rule 23(b)(2) on account of the declaratory relief sought in this civil action. Further, appointment of Plaintiffs' counsel as class counsel is warranted on account of their experience, resources, and familiarity with this case.

---

[1] Pursuant to Local Rule 7(m), Plaintiffs' counsel conferred with Defendants' counsel about the schedule for this motion via e-mail on September 1 and 2, 2026, in which Defendants discussed filing an opposition to this motion.

## BACKGROUND

### A. ICE's ATD Program

ICE administers the ATD program to supervise noncitizens released from detention, for the stated purposes of ensuring compliance with release conditions and increasing court appearance rates. Compl. ¶ 44. As of April 2026, more than 180,000 individuals were enrolled in ATD. Compl. ¶ 48. The primary sub-program within ATD is the Intensive Supervision Appearance Program (ISAP), which is administered and staffed by a private contractor. Compl. ¶¶ 9, 44.

Over time, ATD has relied primarily on four types of supervision technology: the SmartLINK app, GPS ankle monitors, GPS wrist monitors, and telephonic reporting. Compl. ¶ 49. The SmartLINK app uses biometric facial comparison technology to confirm participant identity at check-in, confirms location at the time of check-in, and provides appointment reminders, document upload capability, and communication tools, but does not continuously track a noncitizen's location. Compl. ¶¶ 50–52. Body-worn GPS monitors, by contrast, are secured to the individual's ankle or wrist and continuously log their location and movements in real time, around the clock, and can be configured to alert ISAP case managers when a wearer travels beyond a set distance from home. Compl. ¶¶ 53, 55–56. Telephonic reporting, the fourth form of monitoring, places an automated call to the participant at a predetermined time and matches the individual's voice against a pre-recorded voice print, though it is unclear whether ICE continues to use this option as a standalone form of monitoring. Compl. ¶ 57.

Prior to June 9, 2025, ICE applied a case-by-case, individualized assessment to determine the appropriate type of monitoring and frequency of check-ins for each person enrolled in ATD. Compl. ¶¶ 63–68. More than two decades of ICE policy across multiple presidential administrations required individualized, case-by-case assessment to determine "the most

appropriate level of supervision and technology based upon a multitude of factors," including immigration status, criminal history, compliance history, community ties, caregiver concerns, and humanitarian conditions. *Id.* (quoting June 2017 ATD ISAP Handbook).

For years, ICE policy had treated GPS monitoring as an escalated form of supervision, to be imposed only upon a finding of aggravating factors, such as where a noncitizen lacks access to a smartphone, has a history of program non-compliance or pending criminal charges, or where other public safety or national security concerns require additional monitoring. *See* Compl. ¶¶ 69–79. Indeed, ICE emphasized that body-worn GPS monitoring was "not appropriate for all participants, nor . . . required." Compl. ¶ 68 (quoting Letter from Sean M. Hackbarth, Deputy Asst. Dir., ICE Off. of Cong. Relations to Rep. Byron Donalds (Dec. 26, 2024)). Consistent with this prior policy, several Proposed Class Representatives who had been placed on ankle monitors upon their initial entry into the United States were de-escalated to SmartLINK after demonstrating compliance. Compl. ¶ 81. Only after the Helland Memorandum were they re-shackled with ankle monitors. Decl. M.O. ¶¶ 4, 6–7; Decl. N.I. ¶¶ 7–9; Decl. T.P. ¶¶ 4, 8; Decl. A.S. ¶¶ 3–4, 8.

**B. The Helland Memorandum**

ICE quietly reversed its longstanding policies and practices on June 9, 2025, via the GPS Monitoring Rule, announced in a brief, internally emailed memorandum from Defendant Dawnisha Helland, Acting Assistant Director of ICE's ERO Non-Detained Management Division (Helland Memorandum). Sent to "All ERO Personnel" and titled "Increase of In-Person Check-Ins at Contractor Offices for ATD Participants," the Helland Memorandum contained directives regarding "changes to reporting requirements for aliens assigned to the ATD program." Compl. ¶¶ 84–85.

The Helland Memorandum imposed a series of categorical new requirements with immediate effect. First, it mandated that post-removal order noncitizens in ATD who had been assigned to virtual check-ins move to in-person check-ins. Compl. ¶ 86. Second, and most significantly, it directed that if a noncitizen reporting for a check-in was not being arrested, ICE should "escalate their supervision level to GPS ankle monitors whenever possible and increase reporting requirements, regardless of case type (i.e., pre-order or post-order)." Compl. ¶ 87. Third, it instructed that noncitizens could not be released on Orders of Release on Recognizance or Orders of Supervision without monitoring technology. Compl. ¶ 89. Fourth, the Helland Memorandum departed from—and effectively reversed—prior ICE policy protecting pregnant, postpartum, and nursing individuals, by directing that "[a]ll pregnant females should be placed on wrist-worn technology." Compl. ¶ 88. Because the Helland Memorandum was addressed to all ERO personnel nationwide, and because it employed mandatory language directing escalation to GPS "whenever possible" and prohibiting release without technology, it left ICE officers with no discretion to conduct the individualized assessments that the governing statute, regulations, and prior policy required. *See* Compl. ¶¶ 87, 89, 160.

### C. Implementation of the GPS Monitoring Rule

The GPS Monitoring Rule announced in the Helland Memorandum was promptly implemented across the country, with ICE officers and ISAP employees escalating ATD participants to GPS monitoring and onerous reporting requirements without individualized justification. At N.I.'s September 2025 appointment, an ISAP employee in Maryland stated that all immigrants in Maryland were now required to wear ankle monitors, regardless of their personal circumstances. Compl. ¶ 98. At M.O.'s ICE appointment in July 2025, an officer told her that she and others present needed to wear ankle monitors because of a "mandate from the new

administration." Compl. ¶ 99. At A.S.'s appointment, ISAP officers attributed the ankle monitor requirement to a "new program," and an ISAP officer told T.P. that President Trump had ordered her to wear the monitor. Compl. ¶ 100. Similarly, according to public reporting, ICE officers at the Chantilly, Virginia field office stated in July 2025 that individuals must "either wear hardware or be detained," and ISAP employees at the Manassas, Virginia ISAP office told a noncitizen that "new laws" required imposition of an ankle monitor. Compl. ¶¶ 101–102.

The same indiscriminate approach was replicated across the country. As recently as April 2026, ICE officers at the Baltimore field office described the ankle monitoring policy as "new" and "out of their hands," characterizing enrollment in ATD as equivalent to receiving an ankle monitor; on a single day, ICE placed ankle monitors on approximately 41 individuals at that office. Compl. ¶ 103. In April 2026, ICE officers in Georgia stated that "everyone" was required to be on ankle or wrist monitors under "new policies." Compl. ¶ 104. In October 2025 in San Francisco, ICE officers asserted that anyone released from ICE custody was required to enroll in ISAP and receive an ankle monitor. Compl. ¶ 105. And in Philadelphia in May 2026, ISAP officers stated that "changes in the [ATD] policy" meant that individuals in removal proceedings in that jurisdiction would receive ankle monitors, with the result that "everyone is getting ankle monitors." Compl. ¶ 106.

ICE's publicly available statistics confirm that the Helland Memorandum resulted in a dramatic increase in the imposition of GPS monitors on noncitizens in the ATD program. At the end of Fiscal Year 2024 (September 30, 2024)—before the Helland Memorandum—the ATD program enrolled 179,071 individuals in total, of whom only 17,225 were on ankle monitors, representing fewer than 10 percent of noncitizens in the ATD program. *See* Compl. ¶ 112. By March 7, 2025, the use of monitors had decreased marginally, with 17,155 ankle monitors imposed

among a total ATD population of 183,784 individuals. *See* Compl. ¶ 113. But following the Helland Memorandum in June 2025, the use of body-worn GPS monitors increased sharply. By September 20, 2025, the number of individuals on ankle monitors had risen by about 13,000, to 30,249, while SmartLINK enrollment dropped by roughly 12,000 individuals. Compl. ¶ 114. And by February 7, 2026, ankle monitoring had increased by approximately 12,000 additional individuals, to 42,115, while SmartLINK enrollment declined by a corresponding amount, to 135,279. Compl. ¶ 115. By April 4, 2026, the number of individuals on ankle monitors had reached 46,302—a significant increase from before the GPS Monitoring Rule—while SmartLINK enrollment fell to 131,643. Compl. ¶ 116. All of this occurred while the total number of noncitizens in the ATD program remained essentially stable, increasing by fewer than 1,000 individuals over the same period. Compl. ¶ 118. In essence, the dramatic shift from SmartLINK to GPS monitoring plainly reflects that, as ICE continues to obtain supplies of ankle monitors, body-worn GPS tracking devices are being categorically imposed in furtherance of the Helland Memorandum's unlawful GPS Monitoring Rule.[2]

As described in the Complaint and accompanying declarations, the imposition of GPS monitors has caused serious harm to the Plaintiffs and others. P.O. experiences pain from her ankle

---

[2] While the Rule is mandatory and binding, public reporting has identified "questions about whether the company [that makes the GPS monitors] can meet the ballooning demand." Silvia Foster-Frau and Douglas MacMillan, *ICE moves to shackle some 180,000 immigrants with GPS ankle monitors*, Washington Post (July 24, 2025) https://www.washingtonpost.com/immigration/2025/07/24/ice-check-in-ankle-monitor-immigrants/. As supplies become available, ICE continues to put more noncitizens in ATD on GPS monitors, consistent with the Rule. Indeed, ICE data published after the filing of the Complaint in this civil action reflects the continued application of the GPS Monitoring Rule. As of July 20, 2026, there were 183,181 noncitizens in the ATD program, of whom 53,192 were shackled with an ankle monitor. *See* U.S. Immigration and Customs Enforcement, *Alternatives to Detention: FY26 Detention Stats.*, https://www.ice.gov/doclib/detention/FY26_detentionStats07202026.xlsx (last visited August 12, 2026).

to her knee, has difficulty walking up stairs and bending her leg, and has had her blood pressure reach dangerously elevated levels attributable to the stress of wearing the monitor; she has also stopped breastfeeding her one-year-old daughter as a direct result of the physical and emotional toll of the device. Compl. ¶ 127; Decl. P.O. ¶¶ 16–17, 20. A.S., who works full-time as a hairstylist, suffered from sciatic nerve pain and bleeding where the monitor scraped her skin, could not stand or walk for extended periods, and lost income when monitor malfunctions required her to miss work and report to the ISAP office. Compl. ¶ 130; Decl. A.S. ¶¶ 11–14. T.P., a survivor of human trafficking, reports that the ankle monitor causes her physical pain that disrupts her sleep and forces her to relive the trauma of her trafficking experience; her children have cried upon seeing the monitor, and it serves as a constant reminder of the risk of deportation and separation from her family. Compl. ¶ 129; Decl. T.P. ¶¶ 10–13. N.I. has experienced pain, swelling, and scarring that at times prevented her from walking. Decl. N.I. ¶ 20. M.O. lost her employment as a house cleaner after her employer concluded that clients would not want someone wearing an ankle monitor entering their homes, and she was unable to find replacement employment due both to the stigma of the monitor and the unpredictability of her weekly check-in schedule. Compl. ¶¶ 5, 123; Decl. M.O. ¶¶ 12–15. The stress and anxiety produced by the monitoring devices have caused M.O. to seek mental health treatment and begin taking antidepressant medication for the first time in her life. Decl. M.O. ¶ 21.

### D. The Putative Class Action

On June 26, 2026, the Proposed Class Representatives, through Proposed Class Counsel, filed this putative class action. The Complaint alleges, in five counts, that the GPS Monitoring Rule announced in the Helland Memorandum violates the Administrative Procedure Act because (1) it failed to go through notice and comment; (2) it is arbitrary and capricious; (3) it is contrary

to the Immigration and Nationality Act; (4) it violates the *Accardi* Doctrine; and (5) it violates procedural due process. *See* Compl. ¶¶ 153–94. The Plaintiffs/Proposed Class Representatives bring the action "on behalf of themselves and all others who are similarly situated" within a class defined as: "All noncitizens enrolled, or who will be enrolled, in ICE's Alternatives to Detention program who, on or after June 9, 2025, have been or will be required to wear a body-worn GPS monitor—either an ankle monitor or wrist monitor." Compl. ¶¶ 145–46.

On behalf of the Proposed Class, Plaintiffs/Proposed Class Representatives sought relief in the form of: a declaration that the Defendants' actions violated the APA; vacatur of the Helland Memorandum and the GPS Monitoring Rule; and a declaration that the Defendants must provide Plaintiffs and members of the Proposed Class with an individualized reassessment of what conditions of release, if any, are appropriate to their circumstances without consideration of the GPS Monitoring Rule or the Helland Memorandum. *See* Compl. at 49–50. Solely on behalf of themselves, Plaintiffs sought injunctive relief in the form of an order to Defendants that requires the individualized reassessment of Plaintiffs' release conditions without regard to the GPS Monitoring Rule or the Helland Memorandum. *Id.* at 50.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 authorizes federal courts to determine, "[a]t an early practicable time after a person sues" as a class representative, "whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). To obtain class certification, plaintiffs must first satisfy the four Rule 23(a) requirements: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a)(1)–(4); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Plaintiffs must then show that the case meets the requirements of one of Rule 23(b)'s subsections. Specifically, Rule 23(b)(2) provides that class certification is proper if "the party opposing the class has acted or

refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see Wal-Mart*, 564 U.S. at 360. Upon certifying a class, the Court must also appoint class counsel. Fed. R. Civ. P. 23(g).

## ARGUMENT

### A. The Proposed Class Satisfies the Requirements of Rule 23(a).

#### 1. *The Proposed Class Satisfies Numerosity.*

The Proposed Class satisfies Rule 23's requirement that it be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Demonstrating impracticability of joinder does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *DL v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) (cleaned up) (Lamberth, J.), *aff'd*, 860 F.3d 713, 732 (D.C. Cir. 2017). Although Rule 23(a)(1) does not impose any specific numerical threshold, courts in this District have generally concluded that "numerosity is satisfied when a proposed class has at least forty members." *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 117 (D.D.C. 2017) (quoting *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015)); *accord Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 51 (D.D.C. 2010). In considering "the number of potential class members, the Court need only find an approximation of the size of the class, not 'an exact number of putative class members.'" *Coleman*, 306 F.R.D. at 76 (citation omitted). In addition, "classes including future claimants generally meet the numerosity requirement due to the impracticality of counting such class members, much less joining them." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (cleaned up).

Here, numerosity is easily met. The Proposed Class members number in the tens of thousands. As of April 2026, more than 180,000 noncitizens were obligated to participate in the

ATD program. Compl. ¶ 48. Under the terms of the Helland Memorandum and the GPS Monitoring Rule, *all* such individuals must be on body-worn monitors unless it is impossible to shackle such individuals. And already, the number of individuals in ATD who have been shackled with an ankle monitor has increased by over 35,000 since March 7, 2025.[3] *See* Compl. ¶¶ 113, 116; *supra* n.2. That number alone is sufficient to satisfy numerosity. *See, e.g.*, *O.A. v. Trump*, 404 F. Supp. 3d 109, 155 (D.D.C. 2019) (numerosity satisfied by "reasonabl[e] estimate[,]" based on agency statistics, that class included "thousands of migrants"); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 509 (D.D.C. 2020) (numerosity satisfied by evidence that proposed classes included 6,000 and 2,000 affected noncitizens); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015) (numerosity satisfied by "ample evidence" collected by advocacy groups showing class included 658 noncitizens).

Furthermore, because the Proposed Class includes unnamed future claimants, the total number of class members is likely to be even greater. Because of the Helland Memorandum, large numbers of new class members are regularly being added to the class. Even setting aside the tens of thousands of individuals currently shackled by the Helland Memorandum, classes involving future unnamed class members "generally meet the numerosity requirement," *J.D.*, 925 F.3d at 1322, because of the impracticality of counting (or joining) unnamed future claimants. *See A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) (explaining that when a "class's membership changes continually over time, that factor weighs in favor of concluding that joinder of all members is impracticable" and that the class is sufficiently numerous); *N.S. v. Hughes*, 335

---

[3] The March 7, 2025 data from ICE were the closest-in-time data before the issuance of the Helland Memorandum available to Plaintiffs. Even using the publicly available data from September 20, 2025 (several months after the issuance of the Helland Memorandum), those data still show an increase of over 20,000 individuals placed on ankle monitors to date.

F.R.D. 337, 352 (D.D.C. 2020) (Lamberth, J.). ICE's own statistics make plain that the indiscriminate imposition of body-worn GPS monitors in furtherance of the Helland Memorandum's GPS Monitoring Rule remains ongoing, meaning that there will be unnamed future claimants in the Proposed Class. *See supra* n.2.[4]

Joinder is also made especially impracticable based on the composition of the Proposed Class. The Proposed Class is inherently transient because class members who have been shackled pending their removal cases may be deported from the country upon conclusion of those cases. *See Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014) (citing "the fluidity" of populations in custody as a "factor[] weigh[ing] in favor of finding that numerosity is met"); *Brito v. Barr*, 395 F. Supp. 3d 135, 144 n.3 (D. Mass.), *modified by* 415 F. Supp. 3d 258 (D. Mass. 2019), *affirmed in part and vacated in part on other grounds*, 22 F.4th 240 (1st Cir. 2021) (certifying a class of individuals detained under 8 U.S.C. § 1226(a) and relying, in part, on "[t]he transient nature of the class" as a factor supporting numerosity). The Proposed Class also includes many noncitizens who are unrepresented, are non-English speaking, and lack the financial resources to bring individual claims. *See Brito*, 395 F. Supp. 3d at 144 n.3 (finding numerosity satisfied given "the inability of many [noncitizens] to speak English and secure counsel"); *Mondragon v. Scott Farms, Inc.*, No. 5:17-cv-356-FL, 2019 WL 6125928, at *4 (E.D.N.C. Nov. 18, 2019) (certifying a wage-and-hour class in part because the "class members are geographically dispersed, lack sophistication, and are

[4] For example, recent news reports detail how ICE shackled with ankle monitors Haitian noncitizens with Temporary Protected Status (TPS) following the Supreme Court's decision affirming the government's authority to terminate the TPS program. Lauren Kaori Gurley, Arelis R. Hernandez, Ted Hesson, *ICE begins outfitting Haitian immigrants with ankle monitors, attorneys say*, Washington Post (Aug. 3, 2026), *https://www.washingtonpost.com/immigration/2026/08/03/ice-begins-outfitting-haitian-immigrants-with-ankle-monitors-attorneys-say/*.

non-English speaking migrant workers"); *see also* Decl. M.O. ¶ 35; Decl. N.I. ¶ 28; Decl. T.P. ¶ 23; Decl. A.S. ¶ 28.

The Proposed Class thus satisfies the numerosity requirement of Rule 23(a)(1).

2. *The Proposed Class Satisfies Commonality.*

The Proposed Class satisfies the commonality requirement because it presents "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)(2) is satisfied if *resolution of each plaintiff's claim* turns on a common *question* (or questions) and if common *proof* leads to a common *answer* (or answers) to that question for each plaintiff." *Brown v. District of Columbia*, 928 F.3d 1070, 1080 (D.C. Cir. 2019) (emphasis in original, footnote omitted). "The presence of a single such common question can suffice to satisfy Rule 23(a)(2)." *J.D.*, 925 F.3d at 1321.

The Proposed Class satisfies the commonality requirement because this civil action challenges a "uniform policy or practice that affects all class members." *Lewis v. United States Parole Comm'n*, 351 F.R.D. 64, 77 (D.D.C. 2026) (Lamberth, J.) (quotation omitted); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 333 (D.D.C. 2018) (holding that plaintiffs satisfied commonality where defendants were "systematically denying parole" in violation of their own policy). Here, Defendants have implemented a rule imposing body-worn GPS monitoring devices and onerous reporting requirements on noncitizens in the ATD program without any assessment of an individual's circumstances or the appropriateness of such an elevated form of monitoring. Every member of the Proposed Class has been or will be subject to the unlawful GPS Monitoring Rule announced in the Helland Memorandum. As a result, the claims for all members of the Proposed Class "depend upon [] common contention[s]." *Wal-Mart*, 564 U.S. at 350; *see also DL v. District of Columbia*, 713 F.3d 120, 125 (D.C. Cir. 2013).

The common questions presented by the claims of members of the Proposed Class include:

- Whether the Helland Memorandum's GPS Monitoring Rule is a legislative rule subject to notice and comment rulemaking under the Administrative Procedure Act;

- Whether the Helland Memorandum's GPS Monitoring Rule is arbitrary and capricious under the Administrative Procedure Act;

- Whether the Helland Memorandum's GPS Monitoring Rule is contrary to the Immigration and Nationality Act;

- Whether the Helland Memorandum's GPS Monitoring Rule is contrary to ICE's own regulations and binding policies requiring individualized assessment of the appropriate method of monitoring individuals in ATD, in violation of the *Accardi* doctrine; and

- Whether the Helland Memorandum's GPS Monitoring Rule violates the Fifth Amendment guarantee of procedural due process.

The resolution of these questions will be both "common to and dispositive of each and every proposed class member's individual underlying claims." *Steele v. United States*, 159 F. Supp. 3d 73, 80 (D.D.C. 2016). Each of these contentions is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. In particular, the class members "challenge the same Rule on the same grounds, and all seek the same remedy—invalidation of the Rule." *O.A.*, 404 F. Supp. 3d at 156. Accordingly,"[t]he core issue in this case is the legality of 'a uniform policy or practice that affects all class members.'" *Torres v. Del Toro*, No. 1:21-CV-306-RCL, 2021 WL 4989451, at *6 (D.D.C. Oct. 27, 2021) (Lamberth, J.).

Because the claims in this case challenge a rule, any factual differences among the Proposed Class pose no obstacle to commonality. "[F]actual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members." *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003) (Lamberth, J.). Here, either the Helland Memorandum and GPS Monitoring Rule are unlawful, or they are not. *See, e.g.*, *Love v. Bureau of Prisons*, No. 24-CV-2571 (APM), 2026

WL 1724705, at *7 (D.D.C. June 15, 2026) (holding that commonality is satisfied because Bureau of Prisons "scoring system is legal as applied to either all class members or none," and "the court would be deciding in one fell stroke whether or not the agency practice that allegedly injured the putative class members was legally permissible" (internal quotation marks omitted)). As a result, there is "no evident variation among [the Proposed Class] concerning their ultimate entitlement to relief: if any person in the class has a meritorious claim, they all do." *J.D.*, 925 F.3d at 1321.

Accordingly, the Proposed Class satisfies the commonality requirement of Rule 23(a)(2).

3. *The Proposed Class Satisfies Typicality.*

Plaintiffs' claims are "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Typicality and commonality overlap and "tend to merge" because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). For its part, typicality "is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998) (citing *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)). The typicality requirement "has been liberally construed." *Bynum*, 214 F.R.D. at 34. So long as "the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory," "typicality is ordinarily met." *J.D.*, 925 F.3d at 1322 (citation omitted).

Here, the predominance of common questions of law and fact between the claims of the members of the Proposed Class means that typicality is readily satisfied. Like members of the Proposed Class, each Proposed Class Representative was shackled with a body-worn GPS monitor as a result of the Helland Memorandum and GPS Monitoring Rule. Decl. M.O. ¶¶ 6–7; Decl. N.I.

¶¶ 8–10; Decl. P.O. ¶¶ 8–10; Decl. T.P. ¶ 8; Decl. A.S. ¶ 8. Plaintiffs and members of the Proposed Class "share an identical interest in the invalidation of" the Helland Memorandum's GPS Monitoring Rule. *O.A.*, 404 F. Supp. 3d at 156. "Although the factual circumstances surrounding each case vary slightly, all proposed class members suffer the same injury," *Hughes,* 335 F.R.D. at 354, and each Proposed Class Representative's claims "arise out of the same legal or remedial theory" as the claims of the Proposed Class as a whole such that the typicality requirement is satisfied, *In re Lorazepam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12, 27 (D.D.C. 2001) (cleaned up).

4. *The Proposed Class Satisfies Adequacy.*

Proposed Class Representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "embraces two components: the class representative (i) 'must not have antagonistic or conflicting interests with the unnamed members of the class' and (ii) 'must appear able to vigorously prosecute the interests of the class through qualified counsel.'" *J.D.*, 925 F.3d at 1312 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

The Proposed Class satisfies both elements of the adequacy requirement. First, the Proposed Class Representatives do not have antagonistic or conflicting interests with the unnamed members of the class. Just like the Proposed Class Representatives, the Proposed Class as a whole is subject to the Helland Memorandum's GPS Monitoring Rule requiring the imposition of body-worn location tracking devices. And the two Proposed Class Representatives who are not currently shackled, M.O. and A.S., remain under imminent threat of reimposition of a monitor under the GPS Monitoring Rule. *See* Decl. M.O. ¶¶ 22, 24–25; Decl. A.S. ¶¶ 16-18. The Proposed Class Representatives seek to protect the rights of the class members as a whole, by invalidating the GPS Monitoring Rule announced in the Helland Memorandum.

Second, the Proposed Class Representatives are willing and able to vigorously pursue this litigation on behalf of the Proposed Class and in conjunction with Proposed Class Counsel. The Proposed Class Representatives represent a "breadth of geographic coverage," *Pigford*, 182 F.R.D. at 350 (discussing location of class counsel), residing in Virginia, Maryland, and Colorado. And each has submitted a sworn declaration "demonstrating [her] awareness of the facts of this case[,]" attesting to her understanding of "the responsibilities of a class representative[,]" and expressing her "willing[ness] to protect the class's interests." *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 211 (D.D.C. 2018); *see* Decl. M.O. ¶¶ 27–33; Decl. N.I. ¶¶ 19–26; Decl. T.P. ¶¶ 14–21; Decl. P.O. ¶¶ 22–29; Decl. A.S. ¶¶ 19-26. "That is sufficient to make them adequate representatives." *Zeilinger*, 301 F. Supp. 3d at 211.

**B. Class Certification is Appropriate under Rule 23(b)(2).**

Certification of the Proposed Class is appropriate under Rule 23(b)(2). Through their unlawful promulgation and implementation of the Helland Memorandum's GPS Monitoring Rule, Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"The key to the [Rule 23](b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (cleaned up). And "[t]he rule does not require that both forms of relief be sought and a class action seeking solely declaratory relief may be certified under subdivision (b)(2)." *N.S. v. Dixon*, No. 1:20-CV-101-RCL, 2026 WL 2110726, at *10 (D.D.C. July 22, 2026) (Lamberth, J.) (quoting 7AA Wright & Miller, Fed. Prac. & Proc. § 1775 (3d ed. 2026)). Moreover, "[c]ourts in

this District have certified claims seeking indivisible APA relief such as vacatur under Rule 23(b)(2)." *Gutierrez v. Noem*, No. CV 25-1766 (SLS), 2025 WL 3496390, at *11 (D.D.C. Dec. 5, 2025) (collecting cases).

Rule 23(b)(2) thus "impos[es] two requirements: '(1) that defendant's actions or refusal to act are generally applicable to the class and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class.'" *Robertson v. District of Columbia*, 816 F. Supp. 3d 77, 105 (D.D.C. 2026) (quoting *O.A.*, 404 F. Supp. 3d at 157).

Plaintiffs satisfy both requirements. First, the Plaintiffs, on behalf of the Proposed Class, challenge the promulgation and implementation of the Helland Memorandum's GPS Monitoring Rule, a generally applicable legislative rule that requires the imposition of body-worn GPS monitoring devices and onerous reporting requirements on all noncitizens in the ATD program. The Proposed Class is centered on Defendants' actions that are "generally applicable to the class." *Id.*

Second, Plaintiffs, on behalf of the Proposed Class, seek vacatur and declaratory relief that would benefit the class as a whole. Vacatur would set aside the GPS Monitoring Rule, benefiting all class members. And Plaintiffs request a declaration that (1) Defendants violated the APA by failing to proceed through notice and comment rulemaking when promulgating the GPS Monitoring Rule, by acting arbitrarily and capriciously, and by acting in a manner contrary to statute and the Constitution; and (2) Defendants must provide members of the Proposed Class with an individualized reassessment of what conditions of release, if any, are appropriate without consideration of the GPS Monitoring Rule or Helland Memorandum. *See* Compl. at ¶¶ 49–50. That relief would also aid the class as a whole.

Courts regularly certify classes like this one in the immigration context, including those seeking declaratory relief alongside vacatur under the APA. *See, e.g.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 113–17 (D.C. Cir. 2026) (affirming certification, as modified, of class of noncitizens challenging Presidential proclamation and guidance suspending entry of asylum seekers under the APA and affirming district court's grant of vacatur, declaratory, and injunctive relief); *Gutierrez v. Noem*, No. CV 25-1766 (SLS), 2025 WL 3496390, at *14 (D.D.C. Dec. 5, 2025) (declaratory relief sufficient to certify class); *Pablo Sequen v. Albarran*, 835 F. Supp. 3d 1061, 1103 (N.D. Cal. June 23, 2026), *appeal filed* (certifying classes of noncitizens challenging ICE detention and courthouse arrest policies where classes sought "uniform relief" in the form of APA vacatur of the unlawful policies). The same is true in the federal criminal detention setting. *Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 WL 1635392, at *20 (D.D.C. June 9, 2025) (certifying class seeking only declaration and vacatur of policy regarding transfer of inmates to prerelease custody or supervised release).

"The Rule 23(b)(2) class action, in other words, was designed for exactly this sort of suit." *DL*, 860 F.3d at 726. Accordingly, the Proposed Class satisfies the requirements of Rule 23(b)(2).[5]

[5] The D.C. Circuit has never held that Rule 23 contains an implicit "ascertainability requirement" for certification of a class pursuant to Rule 23(b)(2). *J.D.*, 925 F.3d at 1320; *see O.A.*, 404 F. Supp. 3d at 159 (explaining that the existence of such a requirement was "far from clear" and "disavowed by four federal appellate courts"); *Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 51 (D.D.C. 2021) (questioning existence of implicit ascertainability requirement); *Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 48–49 (D.D.C. 2018) (same). Even assuming ascertainability is a requirement, the Proposed Class satisfies it. Membership in the Proposed Class is defined by "clear and objective criteria" that "do[] not require complicated or individualized determinations." *O.A.*, 404 F. Supp. 3d at 160. And "an individual would be able to determine, simply by reading the class definition, whether he or she is a member of the proposed class." *Hinton*, 567 F. Supp. 3d at 51 (quoting *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 75 (D.D.C. 2015) (cleaned up)).

### C. The Court Should Designate Plaintiffs' Counsel as Class Counsel.

When certifying a class, the Court must also appoint class counsel. Fed. R. Civ. P. 23(g)(1). In appointing class counsel, the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Additionally, the Court "*may* consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B) (emphasis added).

Proposed Class Counsel satisfy these criteria. Plaintiffs are jointly represented by skilled attorneys from three organizations with significant relevant experience: Amica Center for Immigrant Rights (Amica Center), the Robert & Ethel Kennedy Human Rights Center (Kennedy Human Rights), and Zuckerman Spaeder LLP. *See generally* Declaration of Adina Appelbaum (Amica Center Decl.); Declaration of Anthony Enriquez (Kennedy Human Rights Decl.); Declaration of Ivano Ventresca (Zuckerman Spaeder Decl.).

Proposed Class Counsel have already devoted "substantial time and resources to identifying and investigating potential claims in the action," as evidenced by the thorough Class Action Complaint filed in this case on June 26, 2026 (Dkt. No. 1). *Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3, 9 (D.D.C. 2010). To that end, Proposed Class Counsel from Amica Center were involved as co-plaintiffs and co-counsel in Freedom of Information Act litigation that sought information related to the GPS Monitoring Rule. *See Carolina Migrant Network v. Immigr. Customs Enf't*, No. 3:26-cv-00028 (W.D.N.C.); *see also* Compl. at 27 n.37. And Kennedy Human Rights obtained the Charles Memorandum cited in the Complaint through habeas litigation.

Proposed Class Counsel have reviewed scores of agency documents and records, interviewed numerous noncitizens affected by the Helland Memorandum's unlawful GPS Monitoring Rule, and liaised with legal services providers across the country to research the claims set forth in the Complaint.

The Proposed Class Counsel organizations each have substantial relevant experience handling complex civil litigation in federal court—including class actions—as well as specialized experience handling civil rights and immigration matters on behalf of noncitizen plaintiffs. *See* Amica Center Decl. ¶¶ 2–8; Kennedy Human Rights Decl. ¶¶ 1, 5–9; Zuckerman Spaeder Decl. ¶¶ 2, 4–9. Proposed Class Counsel are well-versed in the intricacies of and recent developments in immigration law and federal administrative law. *See* Amica Center Decl. ¶¶ 2–8; Kennedy Human Rights Decl. ¶¶ 3, 5–9; Zuckerman Spaeder Decl. ¶¶ 2, 4, 7–8. Furthermore, Proposed Class Counsel have ample resources that they are willing and able to commit to support the representation of the Proposed Class. *See* Amica Center Decl. ¶ 9; Kennedy Human Rights Decl. ¶ 10; Zuckerman Spaeder Decl. ¶¶ 7, 11–12.

In view of Proposed Class Counsel's experience, resources, and familiarity with the claims in this class action, the Court should appoint Proposed Class Counsel as class counsel in this case.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion for class certification, appoint Plaintiffs M.O., N.I., P.O., T.P., and A.S. as class representatives for the Proposed Class, and appoint the undersigned counsel as class counsel.

Respectfully submitted,

Date: September 24, 2026

*/s/ Ivano Ventresca*

Ivano Ventresca (D.C. Bar No. 1045769)
Monica Sharma (D.C. Bar No. 90013922)
**ZUCKERMAN SPAEDER LLP**
2100 L Street NW, Suite 400
Washington, DC 20037
Phone: 202.778.1842
Email: iventresca@zuckerman.com
msharma@zuckerman.com

Ariella Muller (N.Y. Bar No. 5722699)*
**ZUCKERMAN SPAEDER LLP**
485 Madison Avenue, 19th Floor
New York, NY 10022
Phone: 212.704.9600
Email: amuller@zuckerman.com

*/s/ Lauren Hodges*

F. Evan Benz (N.C. Bar No 49077)*+
Lauren Hodges (A.Z. Bar No. 038791)*++
Adina Appelbaum (D.C. Bar No. 1026331)
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
Phone: 202.331.3320
Email: adina@amicacenter.org
evan@amicacenter.org

*/s/ Sarah E. Decker*

Sarah E. Decker (Bar No. NY0566)
**ROBERT & ETHEL KENNEDY HUMAN RIGHTS CENTER**
1300 19th Street NW, Suite 750
Washington, DC 20036
Phone: 908.967.3245
Email: decker@kennedyhumanrights.org

Anthony Enriquez (Bar No. NY0626)
Sarah T. Gillman (Bar No. NY0316)
**ROBERT & ETHEL KENNEDY HUMAN RIGHTS CENTER**
88 Pine Street, 8th Floor, Suite 801
New York, New York 10005
Phone: 646.289.5593

Email: enriquez@kennedyhumanrights.org
gillman@kennedyhumanrights.org

**Pro hac vice* pending

+Not admitted in D.C.; working remotely from N.C. and admitted in N.C. and GA only
++ Not admitted in D.C.; admitted in AZ only